IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| 3SHAPE TRIOS A/S, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1332-LPS |
| | ) | |
| ALIGN TECHNOLOGY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT ALIGN TECHNOLOGY, INC.'S**
**OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
*Attorneys for Defendant*

OF COUNSEL:
Thomas A. Counts
Thomas Brown
Abigail Wald
Grant Margeson
PAUL HASTINGS LLP
101 California Street
Forty-Eighth Floor
San Francisco, CA 94111
(415) 856-7000

Noah Pinegar
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
(202) 551-1700

Dated: October 17, 2018

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING........................................................................ 1

SUMMARY OF ARGUMENT ........................................................................................ 1

FACTUAL BACKGROUND ......................................................................................... 2

LEGAL STANDARD ................................................................................................. 6

ARGUMENT ........................................................................................................... 8

    I.     THE SHERMAN ACT, SECTION 2 DOES NOT REQUIRE ALIGN TO MAINTAIN INTEROPERABILITY WITH 3SHAPE ......................................... 9

    II.    3SHAPE FAILS TO PLAUSIBLY ALLEGE A RELEVANT PRODUCT MARKET .................................................................................. 12

          A.     3Shape Has Not Alleged Facts Supporting a Clear Aligners Product Market................................................................................ 12

          B.     3Shape Failed to Properly Allege a Market for Scanners for Orthodontic Treatment................................................................. 14

    III.   3SHAPE LACKS STANDING TO BRING ANTITRUST CLAIMS RELATED TO A CLEAR ALIGNERS PRODUCT MARKET.......................... 15

          A.     3Shape Fails to Plausibly Allege Antitrust Injury ..................................... 17

          B.     3Shape Equates Harm to Itself with Harm to Competition ..................... 18

    IV.   DISMISSAL WITHOUT LEAVE TO AMEND IS WARRANTED................... 19

CONCLUSION........................................................................................................ 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alston v. Parker,*
363 F.3d 229 (3d Cir. 2004)..................................................................................19

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985)...........................................................................................9, 10

*Barton & Pittinos v. SmithKline Beecham,*
118 F.3d 178 (3d Cir. 1997)...................................................................................16

*Broadcom Corp. v. Qualcomm Inc.,*
501 F.3d 297 (3d Cir. 2007)........................................................................ *passim*

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993).........................................................................................17, 19

*In re Burlington Coat Factory Sec. Litig.,*
114 F.3d 1410 (3d Cir. 1997)...................................................................................3

*Burtch v. Milberg Factors, Inc.,*
662 F.3d 212 (3d Cir. 2011).................................................................................7, 19

*CCPI Inc. v. American Premier, Inc.,*
967 F. Supp. 813 (D. Del. 1997)............................................................................15

*Crossroads Cogeneration Corp. v. Orange & Rockland Utils.,*
159 F.3d 129 (3d Cir. 1998)...................................................................................14

*Ethypharm S.A. France v. Abbott Labs.,*
707 F.3d 223 (3d Cir. 2013).............................................................................16, 17

*Gulfstream III Assocs. v. Gulfstream Aerospace,*
995 F.2d 425 (3d Cir. 1993)...................................................................................16

*Insight Equity A.P. X, LP v. Transitions Optical, Inc.,*
No. CV 10-635-RGA, 2016 WL 3610155 (D. Del. July 1, 2016).........................11

*Kickflip, Inc. v. Facebook, Inc.,*
999 F. Supp. 2d 677 (D. Del. 2013).........................................................................3

*LePage's v. 3M,*
324 F.3d 149 (3d Cir. 2003)....................................................................................7

*Lifewatch Servs. Inc. v. Highmark Inc.*,
    902 F.3d 323 (3d Cir. 2018)................................................................12, 13, 14

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F.2d 1144 (3d Cir. 1993)....................................................................16, 17

*Nami v. Fauver*,
    82 F.3d 63 (3d Cir. 1996) ...............................................................................19

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ............................................................9, 11, 19

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000).............................................................................3

*Parker v. Learn Skills Corp.*,
    530 F. Supp. 2d 661 (D. Del. 2008)...............................................................18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)..............................................................7, 8, 12, 13

*Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*,
    113 F.3d 405 (3d Cir. 1993)...........................................................................15

*Shionogi Pharma, Inc. v. Mylan, Inc.*,
    Civ. No. 10-1077, 2011 WL 2174499 (D. Del. May 26, 2011).....................15

*Standard Oil v. United States*,
    221 U.S. 1 (1911)..............................................................................................2

*Sun Microsystems v. Versata Enterprises*,
    630 F. Supp. 2d 395 (D. Del. 2009)................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................................3

*Tunis Bros. Co., Inc. v. Ford Motor Co.*,
    952 F.2d 715 (3d Cir. 1991)...........................................................................15

*United States v. Dentsply*,
    399 F.3d 181 (3d Cir. 2005)........................................................................7, 18

*In re Vehicle Carrier Servs. Antitrust Litig.*,
    846 F.3d 71 (3d Cir. 2017)............................................................................6, 7

*Verizon Commc'ns v. Trinko*,
    540 U.S. 398 (2004)......................................................................................9, 19

*W. Penn Allegheny Health Sys., Inc. v. UPMC,*
    627 F.3d 85 (3d Cir. 2010).................................................................................................7, 16

**Statutes**

The Sherman Act ....................................................................................................... *passim*

**Other Authorities**

Areeda, P. & Hovenkamp, H., Antitrust Law ¶ 611e (3d ed. 2011)................................................1

Fed. R. Civ. P. 12(b)(6)..............................................................................................................6, 19

Fed. R. Evid. 201(b).........................................................................................................................3

U.S. Dept. of Labor, Bureau of Labor Statistics,
    https://www.bls.gov/ooh/healthcare/dentists.htm (last visited Sept. 24, 2018).........................3

## NATURE AND STAGE OF THE PROCEEDING

On August 28, 2018, 3Shape Trios A/S ("3Shape") filed its complaint (D.I. 1) for Sherman Act violations by Align Technology, Inc. ("Align"). On September 14, 2018, the Court extended the time for Align to respond through and including October 18, 2018. (D.I. 9). Align submits this opening brief in support of its motion to dismiss the complaint ("Complaint" or "Compl.").

## SUMMARY OF ARGUMENT

Align respectfully requests that the Court dismiss 3Shape's Complaint without leave to amend for failure to state a claim upon which relief can be granted. Although the Complaint does not contain enough well-pled facts to support a claim, it does allege enough to make clear that 3Shape cannot allege facts that, if true, would support a claim. This Court should save its limited resources and resolve this dispute conclusively now, allowing the parties to concentrate on the intellectual property and commercial disputes that they are already contesting before three tribunals around the world.

The Sherman Act protects consumers by protecting the process of competition. It does not protect individual competitors. Firms rise and fall as part of the ebb and flow of healthy and vigorous competition. Every business success and corresponding failure, even the ones that result in complete control of a market, is not actionable under the Sherman Act. As a leading antitrust treatise notes, "[b]uilding a better mousetrap, responding more effectively than rivals to changing consumer tastes, offering higher quality or better service, adopting cost-saving innovations—all competitive moves that enhance one's position vis-à-vis rivals—'exclude' those rivals; the greater the success, the greater the exclusion. If one does not wish to condemn the successful competitor, then the 'exclusion' that occasions condemnation must necessarily be

something other than socially desirable market behavior." Areeda, P. & Hovenkamp, H., Antitrust Law ¶ 611e (3d ed. 2011).

The essence of a Sherman Act Section Two claim is the elimination of all or nearly all competition. Section Two was not created for policing ordinary commercial disputes between rivals. Rather it was enacted to provide a check on true behemoths that might resort to outrageous behavior such as industrial sabotage to control markets. From the earliest days, courts applying Section Two have been careful to distinguish ordinary business conduct—even aggressive competition—from efforts to acquire or maintain dominance over an industry through truly extraordinary means. *See Standard Oil v. United States*, 221 U.S. 1, 75 (1911).

The Complaint filed by 3Shape against Align suffers from two problems that require dismissal of all claims. First, as noted above, the Complaint does not allege facts that if true would support a conclusion that Align engaged in the type of exclusionary conduct necessary to support a claim of monopolization or attempted monopolization under Section Two of the Sherman Act. Second, the Complaint does not allege facts that would enable a court to conclude that the relevant product markets identified in the Complaint—the markets for (1) clear aligners and (2) intraoral scanners for orthodontic treatment that are compatible with clear aligners— actually exist. In addition, the Complaint fails to allege facts that would support a conclusion that 3Shape has antitrust standing to bring a claim for anything that Align has purportedly done related to a product market for clear aligners as 3Shape explicitly concedes that it is not a participant in that market. These deficiencies are fatal to 3Shape's claims.

## FACTUAL BACKGROUND[1]

Americans care about their smiles. As of 2016, there were approximately 153,500 dentists in the United States, a number projected to increase by nearly 20 percent in the next

---

[1] Solely for purposes of this motion, Align assumes the truth of the allegations in the Complaint.

10 years.[2]  And stores are stocked with product to help them keep their teeth clean between their recommended biannual visits to the dentist.  But a healthy smile goes beyond clean teeth and healthy gums.  Americans also want their teeth to be in the right place.  This case takes place in the context of the vast industry that exists to protect and improve the American smile.

Until the early part of the twentieth century, the only tools available to fix teeth would have been familiar to the Romans—removal, dentures, filing down, and primitive braces.  That changed in the early 20th century when Edward H. Angle introduced a classification system for misalignment of teeth—a system still used today—creating modern orthodontics.  Innovation in orthodontics followed after Angle's time bringing, among other things, ceramic braces that blend in with a patient's teeth and lingual braces that attach to the back of teeth.

At the end of the twentieth century, the founders of Align introduced a new method of straightening teeth—a system of customized clear plastic aligners.  In its Complaint, 3Shape claims that Align has cornered the market on clear aligners and a tool that helps Align and other manufacturers of clear plastic aligners configure those aligners—intraoral dental scanners.

***Clear Aligners***.  In 1998, Align received clearance from the U.S. Food and Drug Administration to market the Invisalign system ("Invisalign").  Form 10-K for Align

_____

[2] U.S. Dept. of Labor, Bureau of Labor Statistics, https://www.bls.gov/ooh/healthcare/dentists.htm (last visited Sept. 24, 2018).  In determining a motion to dismiss, courts may consider documents "incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  The Court may judicially notice a fact "that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Public records, including SEC filings, are one type of document the Court may judicially notice. *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).  Documents that are "explicitly relied upon in the complaint" may be considered without turning the motion to dismiss into a motion for summary judgment. *Burlington*, 114 F.3d at 1426; *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677, 682 (D. Del. 2013).

Technology, Inc. for the fiscal year ended Dec. 31, 2017 at 3 ("Align 10-K"). Align markets Invisalign as an innovative method of treating teeth misalignment. Compl. ¶ 14. Invisalign was the first product to use clear, plastic, removable dental aligners to correct misalignment. Compl. ¶ 14. To protect its innovation, Align secured patents for its technology related to Invisalign. Compl. ¶ 31. Align has enforced its intellectual property rights related to Invisalign. Compl. ¶¶ 65-66. 3Shape does not allege that Align's assertion of its patent rights was a sham or that Align secured patents through fraud. *See id.*

As the Complaint alleges, Invisalign is one of several methods that can be used to treat teeth misalignment. Compl. ¶ 15, 76. Since the early twentieth century, U.S.-trained orthodontists have primarily used metal braces to straighten people's teeth. *See* Align 10-K at 4. Other tools to achieve the perfect smile include implants, crowns, bonding, veneers, and dentures. *See, e.g.*, *id.* at 4, 6. Although virtually any misalignment can be treated with braces, clear aligners, like the ones introduced by Align, can serve only a subset of patients; roughly 60% of misalignment cases are treatable by a clear aligner product. *See id.* at 4. Most misalignment patients are treated using braces, even though many could be treated with clear aligners. *See id.* at 4, 17.

As the Complaint alleges, Align obtained many patents related to its novel teeth straightening technology. Several of those patents have expired, meaning that other manufacturers of clear aligners can copy the technology that Align pioneered twenty years ago. Compl. ¶ 15, 31-32. More Align patents relating to Invisalign will expire by 2019. Compl. ¶ 31.

***Intraoral Scanners***. Align also sells scanners that can take digital impressions of a patient's teeth for dental or orthodontic treatment. Compl. ¶ 20. Before Align introduced its scanner, it relied on orthodontists to take physical impressions of people's mouths using silicone

molds.  In late 2015, Align introduced a new intraoral scanner for orthodontic treatment, the iTero Element ("Element").  Compl. ¶ 20.

Align did not invent intraoral dental scanners.  Dentists and orthodontists use scanners for a number of reasons entirely apart from the construction of clear plastic aligners, including monitoring changes in the teeth and gums of patients to restorative treatments such as veneers, inlays, onlays, crowns, bridges and implant abutments to traditional orthodontic appliances like braces and retainers.  *See, e.g.*, Compl. ¶¶ 27-28, 39; Align 10-K at 6.

Intraoral scanners can also be used to configure clear aligners.  Compl. ¶ 21.  Align introduced its scanner, the Element, to do exactly that.  Compl. ¶ 22.  Align also accepts scans from other scanners.  Compl. ¶ 34.  Align earns an additional fee when Element users transmit scans to a non-Align clear aligner manufacturer.  Compl. ¶ 22-23.

3Shape also sells intraoral scanners for dental and orthodontic treatment.  Compl. ¶ 26. 3Shape has been developing dental equipment and software for dental professionals since 2004. Compl. ¶ 25.  3Shape has been selling the Trios system ("Trios") intraoral scanner for over five years.  Compl. ¶ 26.  3Shape does not manufacture or otherwise sell clear aligners, metal braces, or any other orthodontic treatment for tooth misalignment.  Compl. ¶ 25.  Trios, like the Element, can be used to send digital impressions for clear aligners, as well as for the many other dental products and orthodontic treatment options available.  Compl. ¶ 27.

In addition to the Element and Trios, there are numerous other options available for taking impressions for dental and orthodontic treatments, including several other intraoral scanners, such as the Sirona CEREC Omnicam and 3M True Definition scanners, as well as physical impressions or silicone molds.  Compl. ¶¶ 39, 43, 85.

*Interoperability Agreements*.  Align currently accepts impressions for Invisalign cases taken using Element, Sirona CEREC Omnicam and 3M True Definition scanners, as well as silicone molds.  Compl. ¶¶ 34, 38, 85.  Align uses interoperability agreements to negotiate the terms by which it will accept digital impressions from scanners other than its Element.  Compl. ¶¶ 34-35, 38.  From late 2016 to early 2018, Align and 3Shape had an interoperability agreement in place that allowed Trios scans to be used for Invisalign cases.  Compl. ¶ 35.

*Patent Litigation*.  In late 2017, Align determined that 3Shape was infringing its U.S. patents related to its intraoral scanning system and software.  On November 14, 2017, Align filed four patent infringement lawsuits in the United States District Court for the District of Delaware, asserting 26 patents against 3Shape, and filed two Section 337 complaints with the United States International Trade Commission.  Compl. ¶ 50.  Align then terminated its interoperability agreement with 3Shape in the United States.  Compl. ¶¶ 50-51, 53.  Align maintained interoperability agreements for Sirona CEREC Omnicam scanners and 3M True Definition scanners, who are not parties to Align's patent infringement cases against 3Shape.  Compl. ¶¶ 38, 50.  Align continues to accept scans taken with Trios scanners outside of the United States.  Compl. ¶ 56.

Subsequent to terminating its interoperability agreement with 3Shape, Align introduced a new clear aligner product—Invisalign Go, Compl. ¶ 57, and provides discounts for the Element intraoral scanner.  Compl. ¶ 59.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires dismissal where the complaint fails to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F.3d 71, 79 (3d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  However, allegations that "are no more than

conclusions, are not entitled to the assumption of truth." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Tp.*, 629 F.3d 121, 130 (3d Cir. 2010)).

Analyzing a complaint at the motion to dismiss stage, courts first note "the elements a plaintiff must plead to state a claim." *Id*. Then, courts "disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F.3d 71, 79 n.4 (3d Cir. 2017) (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012)). Finally, the court determines whether "the remaining factual allegations suggest that the plaintiff has a plausible—as opposed to merely conceivable—claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

A complaint "satisfies the plausibility standard when the factual pleadings 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Milberg Factors*, 662 F.3d at 220 (quoting *Iqbal*, 556 U.S. at 678). A complaint that "pleads facts 'merely consistent with' a defendant's liability, [ ] 'stops short of the line between possibility and plausibility of 'entitlement of relief.'" *Id*.

To state a claim for monopolization, 3Shape must plausibly allege: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997); *see also United States v. Dentsply*, 399 F.3d 181, 186 (3d Cir. 2005); *LePage's v. 3M*, 324 F.3d 149 (3d Cir. 2003); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-07 (3d Cir. 2007). To plead monopoly power, a plaintiff "typically must plead and prove that a firm has a dominant share in a relevant market, and that significant 'entry

barriers' protect that market." *Broadcom*, 501 F.3d at 307.  As to willful acquisition or maintenance, "[c]onduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive.  Conduct that merely harms competitors, however, while not harming the competitive process itself, is not anticompetitive." *Id.* at 308.

To state a claim for attempted monopolization, a plaintiff must allege that "the defendant (1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power." *Queen City Pizza*, 124 F.3d at 442; *see also Broadcom*, 501 F.3d at 317.  Market share alone is insufficient to show a dangerous probability; rather, the complaint must allege something more, such as "significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand." *Broadcom*, 501 F.3d at 318-19.

## ARGUMENT

With its Complaint, 3Shape attempts to elevate a garden variety commercial issue into the rare air of Section Two of the Sherman Act.  Stripped of the extraneous and conclusory, the Complaint filed by 3Shape alleges that in the context of a patent dispute in which Align claims that 3Shape has infringed Align's technology, Align exercised an at-will termination right provided by an interoperability agreement that had been in place for two years.  According to the Complaint, that single act, which 3Shape does not claim violated the underlying agreement, enabled Align to further a monopoly in one market and bring it close to monopolizing a second. The Complaint does not withstand any scrutiny, and this Court should dismiss it without leave to amend for the following reasons: (1) the Complaint does not allege that Align has engaged in the type of spiteful and inexplicable behavior that is necessary to support a Section Two claim; and

(2) the Complaint fails to allege facts that support either of the markets allegedly affected by the contract termination.  3Shape's claim directed at Align's core business, the business of supplying clear plastic aligners, suffers from an additional flaw: 3Shape concedes it does not participate in a market for such a product, even assuming that one could be defined.

## I.      THE SHERMAN ACT, SECTION 2 DOES NOT REQUIRE ALIGN TO MAINTAIN INTEROPERABILITY WITH 3SHAPE

The Sherman Act, as a general matter, "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns v. Trinko*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate*, 250 U.S. 300, 307 (1919)); *see also Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 316 (3d Cir. 2007) ("A firm is generally under no obligation to cooperate with its rivals.").  With its Complaint, 3Shape apparently seeks to invoke a rare exception to this rule related to unilateral refusals to deal.  As numerous courts, including the Supreme Court, have held, claims related to unilateral refusals to deal lie "at or near the outer boundary of § 2." *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073-74 (10th Cir. 2013) (Gorsuch, J.); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600-01 (1985); *Trinko*, 540 U.S. at 408-10.  3Shape does not allege facts that support the extension of this rare exception to the circumstances alleged in the Complaint.

To invoke a refusal to deal claim, first, there must be a "unilateral termination" of a preexisting "voluntary" and "presumably profitable" course of dealing between the monopolist and rival. *Trinko*, 540 U.S. at 409.  Second, the monopolist's discontinuation of the preexisting course of dealing must also "suggest a willingness to forsake short-term profits to achieve an anti-competitive end." *Id.*  3Shape cannot meet either element.

Unilateral refusals to deal are rare birds in the antitrust firmament. The Supreme Court has only once concluded—in *Aspen Skiing*—that the facts associated with a unilateral refusal to deal could support a claim under Section Two of the Sherman Act. *See Aspen Skiing*, 472 U.S. 585. The plaintiff in that case operated one of a number of mountains in the ski resort of Aspen, Colorado. *See id.* at 589-90. The defendant operated all of the other mountains. *See id.* The plaintiff established at trial that the two parties had long collaborated on means that would enable visitors to ski all the ski runs in Aspen. *See id.* at 589-93. The plaintiff also established that the defendant had unilaterally withdrawn from that long relationship and even refused to sell the plaintiff passes to its mountains at face value so that the plaintiff's tickets and the defendant's tickets could be obtained in a package from the plaintiff. *See id.* at 592-93. On those facts, the Supreme Court upheld a jury verdict in favor of the plaintiff, concluding that without the ability to offer a full Aspen pass, the plaintiff would go out of business, leaving just the defendant. *See id.* at 610-11.

3Shape does not allege facts to bring the conduct challenged here within the narrow exception carved by *Aspen Skiing*. 3Shape does not allege that it and Align had a long history of working together. Nor does 3Shape allege facts that, if true, would enable this Court to conclude that the only explanation for terminating the agreement was the desire to eliminate all competition from the relevant market. And even if the Complaint alleged enough to support a conclusion that 3Shape is doomed commercially without the ability to send scans to Align, it does not contain any facts to explain how the demise of 3Shape affects other makers of intraoral scanners or existing or potentially future makers of clear plastic aligners.

Indeed, the facts alleged in the Complaint tell the opposite story. The Complaint alleges that 3Shape introduced its scanner to the market and successfully sold it without an

interoperability agreement in place. 3Shape was apparently so successful prior to the interoperability agreement that its scanner was named the best intraoral scanner in the industry. Compl. ¶ 26. It also alleges two intuitive justifications for Align's decision to terminate the interoperability agreement: (1) that doing so would increase Align's sales; and (2) that termination of the agreement followed the initiation of a patent dispute between the parties in which Align claimed that 3Shape was infringing its patents. *See Novell*, 731 F.3d 1075 (holding that it is not anticompetitive "to withdraw from a prior course of dealing and suffer a short-term profit loss in order to pursue perfectly procompetitive ends—say, to pursue an innovative replacement product"). Again, the Complaint alleges that following termination of the interoperability agreement, Align competed aggressively by launching a new product—the Invisalign Go, *see* Compl. ¶ 59—and providing discounts to buyers. *See* Compl. ¶ 61. The Complaint even acknowledges that this is the kind of conduct the antitrust laws seek to encourage—i.e., "what any company in a competitive market should do—improve its products and lower costs." Compl. ¶ 33.

In the end, the Complaint alleges facts that render the claims hopeless. 3Shape was a viable competitor to Align before the parties entered into the interoperability agreement. Align had ample justification for exercising the at-will termination provision in that agreement, both to increase its sales and protect its intellectual property by not accepting scans from a process that infringes Align patents. And the Complaint contains literally nothing to support a conclusion about how the end of a single agreement with a single competitor, even if it were to lead to the demise of that competitor, would affect competition as a whole. *See Insight Equity A.P. X, LP v. Transitions Optical, Inc.*, No. CV 10-635-RGA, 2016 WL 3610155, at *13 (D. Del. July 1, 2016) (holding that termination of a single agreement is "not, in itself, a refusal to deal").

## II.    3SHAPE FAILS TO PLAUSIBLY ALLEGE A RELEVANT PRODUCT MARKET

Even assuming the Complaint contains allegations that support a conclusion about the existence of exclusionary conduct, 3Shape's alleged product markets are fatally deficient.  A plaintiff has the burden of defining the relevant market.  *Queen City Pizza,* 124 F.3d at 436.  As the Third Circuit has held, "[c]ompeting products are in the same market if they are readily substitutable for one another; a market's outer boundaries are determined by the reasonable interchangeability of use between a product and its substitute, or by their cross-elasticity of demand."  *Broadcom*, 501 F.3d at 307.  Cross-elasticity of demand "is a measure of the substitutability of products from the point of view of buyers.  More technically, it measures the responsiveness of the demand for one product to changes in the price of a different product." *Queen City Pizza*, 124 F.3d at 438 n.6.

The Third Circuit has instructed courts to dismiss complaints that seek to define a market "without reference to interchangeability or cross-elasticity of demand."  *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018).  It has also instructed courts to dismiss complaints that attempt to define a market that "'that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor.'"  *Id.* (quoting *Queen City Pizza*, 124 F.3d at 436).  Even assuming 3Shape's allegations, its product markets fall short.  Accordingly, dismissal is appropriate.

### A.    3Shape Has Not Alleged Facts Supporting a Clear Aligners Product Market

The Complaint does not plausibly allege a Clear Aligners product market.  It does not contain allegations about customers' willingness to substitute other products for clear aligners, as required to state an antitrust claim.  *See Queen City Pizza*, 124 F.3d at 439 n.8 ("In a typical antitrust case, plaintiffs assert that the products or services in their proposed relevant product market are reasonably interchangeable because they possess positive cross-elasticity of demand:

a rise in the price of one product in the market will increase demand for the other items in the market"). The Complaint does not allege anything about the relationship between the price and sales of one product for teeth straightening versus another—cross-elasticity of demand. This alone merits dismissal. *See Lifewatch*, 902 F.3d at 337.

The Complaint also fails to explain why the obvious alternatives to clear aligners fall outside the relevant product market. The only statement in the Complaint on this subject is purely conclusory: "unlike traditional metal braces, clear aligners are not suitable for patients with major dental misalignment." Compl. ¶ 76. In addition to being inaccurate, this allegation is beside the point. For purposes of defining a market for clear aligners, the issue is whether braces or other products are economic substitutes for the uses <u>for which clear aligners are suitable</u>. The Complaint is silent on this, the central inquiry. *See Queen City Pizza*, 124 F.3d at 438 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) ("The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'")).

It is insufficient for 3Shape to allege that clear aligners require less time for treatment than traditional metal braces, *see* Compl. ¶ 77, or that clear aligners are "more suitable for patients engaged in activities … *e.g.*, contact sports." Compl. ¶ 76. It does not follow from these differences that braces and clear aligners are not in the same relevant market. As the Third Circuit has said, "[i]nterchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may some degree of preference for the one over the other, either would work effectively." *Queen City Pizza*, 124 F.3d at 437. 3Shape makes no allegation as to the cross-elasticity of demand between other products (including braces) and

clear aligners and provides no factual allegations supporting whether other products constrain the price of clear aligners, which it must to avoid dismissal. *See Lifewatch*, 902 F.3d at 337.

The Complaint's conclusory allegation of Align having a significant market share does not save it. "[E]ven under the pre-*Twombly* standard articulated in *Crossroads* [*Cogeneration Corp. v. Orange & Rockland Utils.*, 159 F.3d 129, 141 (3d Cir. 1998)], alleging market share alone was not enough to state an antitrust claim." *Sun Microsystems v. Versata Enterprises*, 630 F. Supp. 2d 395, 404 (D. Del. 2009). As such, 3Shape's alleged Clear Aligners market fails.

**B. 3Shape Failed to Properly Allege a Market for Scanners for Orthodontic Treatment**

The Complaint also fails to plausibly allege a relevant market for the manufacture and sale of digital intraoral scanners used by dental professionals to generate full mouth scans for orthodontic treatment, including for ordering clear aligners in the United States ("Market for Scanners For Orthodontic Treatment," or "Scanners"). The Complaint artificially restricts the market definition for Scanners to fit its antitrust story but omits factual allegations necessary to support its proposed market. Dismissal is appropriate.

The Complaint acknowledges that Align accepts scans from two other intraoral dental scanners and that still other intraoral dental scanners exist. *See* Compl. ¶ 38. The Complaint does not, however, allege facts to explain why the scanners from which Align accepts scans fall outside the market that it claims exists. Instead, 3Shape claims only that neither the True Definition nor the CEREC Omnicam is an "adequate substitute[]." *See* Compl. ¶¶ 39-41. The existence of differences does not take these scanners out of the market. As many courts have recognized, "[d]ifferentiation is often present among competing products in the same market." *Lifewatch*, 902 F.3d at 339. Whether the True Definition and CEREC Omnicam are economic substitutes for the Element and Trios scanners is the key issue, and the Complaint does not

provide facts to support an answer. The Complaint also acknowledges that other intraoral dental scanners exist. It does not identify them by name, but simply says that there are a "handful" of them. Compl. ¶ 43. With regard to these scanners, the Complaint says nothing.

These allegations are not sufficient to define the market that must exist to support 3Shape's claim. The Complaint essentially asks the Court to trust that 3Shape will be able to come up with something to explain why other intraoral scanners do not fall in the market necessary to support its attempted monopolization claim. As the Third Circuit has held, the Court is under no obligation to accept "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1993), and it is inappropriate to do so. *See, e.g.*, *CCPI Inc. v. American Premier, Inc.*, 967 F. Supp. 813, 817 (D. Del. 1997) ("a party cannot adequately plead a relevant market with a bare assertion that a commodity is unique in some way"); *Shionogi Pharma, Inc. v. Mylan, Inc.*, Civ. No. 10-1077, 2011 WL 2174499, at *5-*6 (D. Del. May 26, 2011).

3Shape's allegation of the geographic market further illustrates the deficiency of its product market allegations. 3Shape offers nothing more than a one-sentence conclusory statement that the geographic market is the United States, *see* Compl. ¶ 86, which is insufficient. *See Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 726-27 (3d Cir. 1991) ("The mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market"). 3Shape fails to plead facts to support the relevant product markets it alleges, falling well short of plausibility.

## III.  3SHAPE LACKS STANDING TO BRING ANTITRUST CLAIMS RELATED TO A CLEAR ALIGNERS PRODUCT MARKET

3Shape lacks standing to bring antitrust claims related to an alleged Clear Aligners

product market in which it does not participate as a competitor or consumer.  In the Third

Circuit, antitrust standing is determined by several factors:

> (1) the causal connection between the antitrust violation and the harm to the
>
> plaintiff and the intent by the defendant to cause that harm, with neither factor
>
> alone conferring standing; (2) whether the plaintiff's alleged injury is of the type
>
> for which the antitrust laws were intended to provide redress; (3) the directness of
>
> the injury, which addresses the concerns that liberal application of standing
>
> principles might produce speculative claims; (4) the existence of more direct
>
> victims of the alleged antitrust violations; and (5) the potential for duplicative
>
> recovery or complex apportionment of damages.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993).

Antitrust injury, the second factor, "is a necessary but insufficient condition of antitrust

standing."  *Barton & Pittinos v. SmithKline Beecham*, 118 F.3d 178, 182 (3d Cir. 1997).

Generally, "the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited

to consumers and competitors in the restrained market, and to those whose injuries are the means

by which the defendants seek to achieve their anticompetitive ends."  *W. Penn Allegheny Health

Sys. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010).  Antitrust injury requires a showing that "there

exists a 'significant causal connection' such that the harm to the plaintiff can be said to be

'inextricably intertwined' with the antitrust conspiracy."  *Gulfstream III Assocs. v. Gulfstream

Aerospace*, 995 F.2d 425, 429 (3d Cir. 1993).  Importantly, the Third Circuit has "not extended

the 'inextricably intertwined' exception beyond cases in which both plaintiffs and defendants are

in the business of selling goods or services *in the same relevant market*."  *Ethypharm S.A.*

*France v. Abbott Labs.*, 707 F.3d 223, 237 (3d Cir. 2013).  3Shape's allegations fail to meet this requirement.

### A.      3Shape Fails to Plausibly Allege Antitrust Injury

The Complaint does not contain facts that would enable this Court to conclude that 3Shape has suffered antitrust injury.  Assuming that a Clear Aligners market exists, the Complaint does not allege that 3Shape participates in it either as a competitor or a consumer, which it must under *Ethypharm*.  In place of participation, the Complaint asserts that "3Shape's injury is also inextricably intertwined with Align's anticompetitive conduct and harm to competition in the Clear Aligner Market."  Compl. ¶ 72.  The allegation that Align has injured 3Shape in an assumed market for Scanners does not support a conclusion that 3Shape has a stake in the entirely different assumed market for Clear Aligners.

Even if *Ethypharm* did not preclude antitrust standing for 3Shape in Clear Aligners, 3Shape would have to plausibly allege facts to support the facially implausible: (i) that braces and other methods of straightening teeth do not constrain the price of clear aligners for patients for whom clear aligners are an option; (ii) that Align terminated a single, two-year interoperability agreement with 3Shape not because 3Shape infringed Align's patents or because it would increase Align's scanner sales; (iii) that Align's termination of interoperability with 3Shape was done to reduce other clear aligner manufacturers' ability to make sales, notwithstanding the continued interoperability and use of several other intraoral scanners (besides those of 3Shape and Align) and silicone molds by dentists and orthodontists; (iv) that Align's termination of interoperability with 3Shape, which preceded discounts and new product introductions, harmed not just 3Shape but competition itself in Clear Aligners, and (v) that injury to 3Shape in this sequence is "of the type for which the antitrust laws were intended to provide

redress." *Lake Erie*, 998 F.2d at 1165-66. This chain of causation is facially implausible, and in any event, the Complaint does not even attempt to allege its existence.

**B.  3Shape Equates Harm to Itself with Harm to Competition**

That 3Shape has lost sales, allegedly due to the termination of interoperability with Align, is insufficient to plead antitrust injury. "It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'" *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). "Conduct that merely harms competitors," without "harming the competitive process itself, is not anticompetitive." *Broadcom v. Qualcomm*, 501 F.3d 297, 308 (3d Cir. 2007); *see also United States v. Dentsply*, 399 F.3d 181, 187 (3d Cir. 2005); *Parker v. Learn Skills Corp.*, 530 F. Supp. 2d 661, 677 (D. Del. 2008).

3Shape alleges that "[u]ntil recently, the anticompetitive effects of Align's interoperability limits were mitigated because 3Shape had an interoperability agreement with Align for the Trios scanner." Compl. ¶ 35. The single interoperability agreement was signed by Align and 3Shape in December 2015. *Id.* Align terminated the single interoperability agreement with 3Shape in January 2018. Compl. ¶ 54. These allegations taken as true suggest that, absent interoperability between the 3Shape scanner and Align, both the alleged Clear Aligners and Scanners product markets are monopolized. The implication is that the 3Shape scanner is the sole means of preserving competition in both product markets. Yet 3Shape has not alleged that interoperability agreements with "a limited number of authorized scanners," Compl. ¶ 34, have been terminated or that the "handful of other scanners capable of generating full mouth scans" without interoperability, Compl. ¶ 43, were harmed.

3Shape claims that competition itself is ruined in a Clear Aligners product market after Align ended the interoperability contract. *See* Compl. ¶ 60-61. But 3Shape was able to sell

intraoral scanners for years without any interoperability agreement with Align, *see* Compl. ¶¶ 25-27, which was not signed until December 2015.  Compl. ¶ 35.  3Shape further contradicts itself by suggesting that competition in Clear Aligners and Scanners was present only during the two year interoperability agreement, *see* Compl. ¶¶ 35, 54, without which competition is ruined.  And yet 3Shape alleges it was named "best intraoral scanner by the industry for five years in a row," Compl. ¶ 26, meaning that competition was vigorous before 3Shape had interoperability with Align and will remain so after interoperability has ended.  The Court is not obligated to accept as true 3Shape's "self-evidently false" allegations.  *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

3Shape's allegations equate harm to 3Shape with harm to competition.  That 3Shape alone is diminished—through lost sales—by a single, two-year agreement between itself and Align ending is insufficient to support the allegation that competition itself was harmed by Align's termination of interoperability with 3Shape.  Protecting competition, not competitors, remains the focus of the Sherman Act.  *See Brooke Group*, 509 U.S. at 224.

## IV.  DISMISSAL WITHOUT LEAVE TO AMEND IS WARRANTED

3Shape's antitrust claims merit dismissal without leave to amend.  Leave to amend need not be granted if "amendment would be inequitable or futile."  *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004).  "Futility 'means that the complaint, as amended, would fail to state a claim upon which relief could be granted.'"  *Burtch v. Milberg Factors*, 662 F.3d 212, 231 (3d Cir. 2011) (quoting *Great Western Mining & Min. v. Rothschild LLP*, 615 F.3d 159, 175 (3d Cir. 2010)).  The same standard of legal sufficiency applies as under FRCP 12(b)(6).  *Burtch*, 662 F.3d at 231.

3Shape cannot allege a cognizable antitrust claim under the narrow and disfavored refusal to deal theory, as explained in *Trinko*, 540 U.S. 398, and *Novell*, 731 F.3d 1064.  Termination of a single, two-year contract between two companies cannot simultaneously destroy competition in

two separate product markets, each of which is implausible.  This is particularly true given the numerous other facts 3Shape alleges: that 3Shape faces patent litigation for infringing dozens of Align patents; 3Shape operated for over a decade without an interoperability agreement with Align, including a period during which the Trios scanner won awards; Align introduced an intraoral scanner that competed with 3Shape's scanner just fine without interoperability; following termination of interoperability, Align provided discounts—price competition—for dental providers to use Align's scanner product; and following termination of interoperability, Align introduced a new clear aligner product, the Invisalign Go.  Any injury to 3Shape during the course of these events is the result of vigorous competition—to the benefit of consumers— and not an antitrust violation.

Additionally, 3Shape's Complaint had the benefit of time and, presumably, investigation. Termination of interoperability occurred January 31, 2018.  Compl. ¶ 54.  3Shape filed its Complaint on August 28, 2018.  *See* Compl. (D.I. 1).  Allowing 3Shape to amend its Complaint would be futile.

## **CONCLUSION**

For the foregoing reasons, Align respectfully requests that the Court dismiss 3Shape's Complaint.

Respectfully submitted,

SHAW KELLER LLP

*/s/ John W. Shaw*

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
*Attorneys for Defendant*

OF COUNSEL:
Thomas A. Counts
Thomas Brown
Abigail Wald
Grant Margeson
PAUL HASTINGS LLP
101 California Street
Forty-Eighth Floor
San Francisco, CA 94111
(415) 856-7000

Noah Pinegar
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
(202) 551-1700

Dated: October 17, 2018