**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| 3SHAPE TRIOS A/S, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1332-LPS |
| | ) | |
| ALIGN TECHNOLOGY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This is an antitrust case.  Plaintiff 3Shape Trios A/S ("3Shape" or "Plaintiff") filed suit against Defendant Align Technology, Inc. ("Defendant" or "Align") on August 28, 2018, alleging violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.  (D.I. 1.)  Align sells the Invisalign system, an orthodontic treatment for straightening teeth without metal braces.  It involves the use of custom-made, plastic dental aligners.  To make the aligners, Align requires a dental professional to obtain an impression of the patient's teeth and transmit that impression to Align.  One way to take an impression is with a digital intraoral scanner.  In September 2015, Align introduced a scanner called the iTero Element, which can be used to order Invisalign from Align.  When the iTero Element entered the market, 3Shape was already selling a competing scanner called the Trios.  This dispute ensued.

This case is not the only litigation between these two parties.  On November 14, 2017, Align filed four separate patent infringement lawsuits (asserting 26 patents) against 3Shape, all of which relate to 3Shape's Trios scanner.  (Nos. 17-1646, -1647, -1648, -1649 (D. Del.).)  3Shape then filed two patent infringement lawsuits against Align, both of which relate to Align's iTero Element scanner.  (Nos. 18-697, -886 (D. Del.).)

1

This case is the parties' latest dispute in this Court.  Here, 3Shape alleges that Align has (1) attempted to monopolize the market for scanners and (2) monopolized the market for aligners.  Unlike many antitrust cases filed against patent-wielding competitors, 3Shape does not allege that Align's infringement suits against 3Shape were baseless or that Align obtained its patents through fraud.  Instead, 3Shape points to several actions taken by Align (including patent litigation activity) that, according to 3Shape, together amount to an anticompetitive scheme that violates the antitrust laws.

Pending before the Court is Align's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Because 3Shape has failed to allege acts that—taken individually or together—constitute anticompetitive conduct, I recommend that Align's motion be GRANTED.

## I. BACKGROUND[1]

Defendant Align is a Delaware corporation that sells Invisalign, a system of clear plastic aligners for straightening teeth.  (D.I. 1 ¶¶ 13-14.)  Align is the leading seller of dental aligners in the United States and has over 80% of the market.  (*Id.* ¶¶ 15, 29-30.)  Align originally obtained market dominance as a result of numerous patents covering its Invisalign technology.  (*Id.* ¶¶ 29-31.)  Many of those patents have now expired and more will be expiring this year.  (*Id.* ¶ 31.)

Invisalign aligners are custom made and must be obtained from dental professionals, who order them from Align.  (*Id.* ¶¶ 14, 18.)  To order Invisalign, a dental professional must send a digital or physical impression of a patient's teeth to Align.  (*Id.* ¶ 34.)  Align also sells the iTero Element digital intraoral scanner, which can be used to obtain a digital impression for ordering aligners.  (*Id.* ¶ 20.)

---

[1] I assume the facts alleged in the Complaint to be true for purposes of resolving this motion.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff 3Shape is a Danish corporation that designs and manufactures dental equipment and software, including digital intraoral scanners. (*Id.* ¶¶ 12, 25.) 3Shape sells the Trios digital intraoral scanner, which "can be used for scanning, designing and ordering of clear aligners and a number of other orthodontic treatments or dental products." (*Id.* ¶ 25.) 3Shape's Trios scanner was already on the market when Align introduced the iTero Element scanner in September 2015. (*Id.* ¶¶ 20, 25-26.)

According to the Complaint, Align's iTero Element and 3Shape's Trios are the only two scanners on the market that can effectively and efficiently be used to order clear aligners. (*Id.* ¶ 28.) There are other digital scanners on the market, including the 3M True Definition and Sirona CEREC Omnicam. According to the Complaint, those scanners were designed to scan individual teeth for crowns and for other local dental restorative work, and they are not viable options for ordering clear aligners. (*Id.* ¶¶ 38-39, 42.)

The Complaint describes the following categories of conduct that, 3Shape contends, demonstrate Align's anticompetitive scheme to monopolize the scanner and aligner markets. (D.I. 17 at 6-8, 10-12.) The first category includes Align's patent litigation activities. (D.I. 1 ¶ 64.) Align filed patent infringement suits against OrthoClear and SmileDirectClub, two smaller aligner manufacturers. (*Id.* ¶¶ 65-66.) The OrthoClear case settled in 2006, resulting in OrthoClear going out of business. (*Id.* ¶ 65.) The SmileDirectClub case settled in 2016, resulting in SmileDirectClub going into business with Align. (*Id.* ¶ 66.) Subsequently, in November 2017, Align sued 3Shape for infringement of Align's scanner technology. (*Id.* ¶ 50.) The Complaint alleges that these lawsuits were designed to drive Align's competitors out of business. But it does not allege that any of the litigations were objectively baseless or that Align's patents were obtained through fraud.

The second category relates to Align's unsuccessful attempts to enter into business deals with 3Shape. From 2015 to 2017, Align repeatedly asked 3Shape to configure its Trios scanners to send scans exclusively to Align (and not to other clear aligner manufacturers). (*Id.* ¶¶ 44-49.) 3Shape refused. (*Id.*) In 2016, Align asked 3Shape to enter into a joint business venture, but 3Shape again refused. (*Id.*)

The third category of conduct relates to the execution and termination of a 2015 agreement between Align and 3Shape, which the parties refer to as the "Interoperability Agreement." Prior to the agreement, 3Shape's Trios scanners were incapable of sending digital scans directly to Align. (*Id.* ¶ 35.) Under the agreement, Trios scanners could (but were not required to) send scans directly to Align, and Align agreed to accept Invisalign orders directly from Trios scanners. (*Id.* ¶ 35.) The parties signed the agreement in December 2015, and Align "certified" the Trios scanner to send scans directly to Align beginning in October 2016. (*Id.*) Between October 2016 and January 2018, dental professionals sent over 40,000 Invisalign orders using Trios scanners. (*Id.* ¶ 36.)

In December 2017, the month after Align filed four patent infringement lawsuits against 3Shape relating to the Trios scanner, Align notified 3Shape that it was terminating the Interoperability Agreement. (*Id.* ¶¶ 50-53.) Since the termination, which became effective in January 2018, Align no longer accepts scans sent directly from Trios scanners. (*Id.* ¶¶ 53, 59.) Align still has interoperability agreements with two other scanner manufacturers, 3M and Sirona. (*Id.* ¶ 38.) But Align told 3Shape in November 2017 that it "will not validate any additional intraoral scanners for use with Invisalign." (*Id.* ¶ 60.)

The fourth category of conduct relates to Align's introduction of the iTero Element Scanner in 2015. (*Id.* ¶ 20.) Align designed the iTero Element with the capability to send digital scans

4

directly to Align for orders of Invisalign.  (*Id.* ¶ 22.)  The iTero Element cannot send scans directly to Align's competitors in the aligner market.  (*Id.* ¶¶ 22-23.)  However, a dental professional can send iTero Element scans to other aligner manufacturers by taking additional "steps" and paying Align a "fee."  (*Id.* ¶ 23.)  The Complaint does not provide any further information about the additional steps or the fees.

The fifth and final category of conduct involves Align's offering of price discounts. Around the time it terminated the Interoperability Agreement with 3Shape, Align launched a discount program for its iTero Element scanner.  (*Id.* ¶ 57.)  Under the program, owners of 3Shape's Trios scanners received a "steep" discount on the purchase of an iTero Element scanner, conditioned on the purchaser meeting a "target" number of Invisalign orders over three years.[2] (*Id.*)  The Complaint contains no further details about the size of the discount or the target number.

According to the Complaint, Align's conduct has harmed 3Shape's scanner business. Dental professionals have stopped buying 3Shape's Trios scanner because it cannot send scans directly to Align.  (*Id.* ¶¶ 68-69.)  For the same reason, 3Shape has experienced some order cancellations and returns of the Trios scanner, and 3Shape lost a bid to supply scanners to a large Dental Service Organization.  (*Id.* ¶¶ 68, 70.)

3Shape's Complaint sets forth the following claims: monopolization of the clear aligner market under Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count 1); and attempted monopolization of the market for scanners for orthodontic treatment under Section 2 of the

---

[2] The Complaint alleges that Align "improperly" used 3Shape's customer list in connection with the discount program, but it doesn't say what Align did or why it was improper.  (*Id.* ¶ 57.) There are no allegations that Align employed bad faith, deceptive, or illegal conduct.

Sherman Act (Count 2).[3]  (D.I. 1 ¶¶ 87, 96, 104.)

Align filed the pending motion to dismiss on October 17, 2018 (D.I. 11), and the parties have completed the briefing.  (D.I. 12, 17, 18.)  Both parties requested oral argument (D.I. 19, 20), and I heard oral argument on August 1, 2019.  ("Tr. __".)

## II.  LEGAL STANDARDS

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A possibility of relief is not enough.  *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  In determining the sufficiency of the complaint under the plausibility standard, all "well-pleaded facts" are assumed to be true, but legal conclusions are not.  *Id.* at 679.

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Twombly*, 550 U.S. at 558 (internal marks omitted). "Antitrust claims in particular must be reviewed carefully at the pleading stage because false

---

[3] The Complaint also contains a request styled as "Count Three," in which 3Shape seeks an anti-suit injunction against Align.  (D.I. 1 ¶¶ 104-113.)  3Shape does not oppose dismissal of this Count.  (D.I. 17 at 3 n.2.)  Accordingly, I recommend dismissal of Count 3.

condemnation of competitive conduct threatens to 'chill the very conduct the antitrust laws are designed to protect.'" *In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 218 (S.D.N.Y. 2019) (quoting *Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004)).  However, the same *Twombly* plausibility standard applies.  *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) ("[I]t is inappropriate to apply Twombly's plausibility standard with extra bite in antitrust and other complex cases.").

## III. DISCUSSION

Section 2 of the Sherman Act, 15 U.S.C. § 2, makes it unlawful to "monopolize" or "attempt to monopolize."[4]  It does not prohibit monopolies.  Indeed, the possession of monopoly power is not only legal, "it is an important element of the free-market system."  *Trinko*, 540 U.S. at 407 ("The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth.").

A Section 2 plaintiff must therefore do more than just prove a monopoly.  To succeed on a monopolization claim, the plaintiff must demonstrate both (1) the defendant's possession of monopoly power in a relevant market and (2) anticompetitive conduct.  *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).  To establish attempted monopolization, the plaintiff must show (1) anticompetitive conduct, (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power in a relevant market.  *Phila. Taxi Ass'n, Inc.*

---

[4] "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."  15 U.S.C. § 2.

*v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir. 2018).  Importantly, both types of claims require

"anticompetitive conduct."  *See id.* at 338 ("Anticompetitive conduct is the hallmark of an antitrust

claim.").  A private plaintiff (as opposed to a government plaintiff) must also demonstrate that it

suffered injuries caused by the defendant's anticompetitive conduct.  *Brunswick Corp. v. Pueblo*

*Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281

(3d Cir. 2012).

      Align argues that the Complaint fails to plausibly allege anticompetitive conduct.  I agree.

      Anticompetitive conduct is "generally defined as conduct to obtain or maintain monopoly

power as a result of competition on some basis other than the merits."  *Broadcom*, 501 F.3d at 308.

On the other hand, "[c]onduct that merely harms competitors, . . . while not harming the

competitive process itself, is not anticompetitive."  *Id.*; *W. Penn*, 627 F.3d at 108 ("The line

between anticompetitive conduct and vigorous competition is sometimes blurry, but distinguishing

between the two is critical, because the Sherman Act 'directs itself not against conduct which is

competitive, even severely so, but against conduct which unfairly tends to destroy competition

itself.'").  Accordingly, in order to be deemed exclusionary, a monopolist's conduct must have an

anticompetitive effect on the market.  *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir.

2001).

      "'Anticompetitive conduct' can come in too many different forms, and is too dependent

upon context, for any court or commentator ever to have enumerated all the varieties."  *LePage's*

*Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003) (quoting *Caribbean Broad. Sys., Ltd. v. Cable &*

*Wireless PLC*, 148 F.3d 1080, 1087 (D.C.Cir.1998)).  Examples of agreements that may constitute

anticompetitive conduct under Section 2 include conspiracies to exclude a rival, *W. Penn*, 627 F.3d

at 109, exclusive dealing arrangements, *United States v. Dentsply*, 399 F.3d 181, 187 (3d Cir.

2005), and tying agreements, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992).

As a general rule, however, "purely unilateral conduct does not run afoul of section 2 – 'businesses are free to choose' whether or not to do business with others and free to assign what prices they hope to secure for their own products." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (citing *Pac. Bell Tel. Co. v. linkLine Commc'ns*, 555 U.S. 438, 448 (2009)); *see also Trinko,* 540 U.S. at 408 ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *Broadcom*, 501 F.3d at 316 ("A firm is generally under no obligation to cooperate with its rivals.").

But general rules generally have exceptions, and the rule protecting unilateral conduct does too. One exception is predatory pricing. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-23 (1993). A more controversial exception (albeit one recognized in the Third Circuit) is bundled discounts. *LePage's*, 324 F.3d at 154-58. Another is antitrust duty to deal. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600-01 (1985). Courts also recognize that deceptive or bad faith conduct can be anticompetitive. *See Broadcom*, 501 F.3d at 314 (patentee's deception of a standards setting organization can be anticompetitive); *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60-61 (1993) ("*PRE*") (sham litigation can be anticompetitive). As explained in more detail below, there are legal rules that govern the application of each of these exceptions.

The Complaint in this case sets forth five categories of conduct that, 3Shape alleges, are anticompetitive: (1) Align's institution of patent infringement suits against its competitors; (2)

Align's unsuccessful attempts to enter into business deals with 3Shape; (3) Align's termination of the agreement to accept scans directly from 3Shape's Trios scanners; (4) Align's introduction of the iTero Element scanner; and (5) Align's provision of price discounts on iTero Element scanners. For the reasons set forth below, I agree with Align that those actions do not constitute actionable anticompetitive conduct, viewed either alone or together.

### A.  Patent litigation

"A patent . . . is an exception to the general rule against monopolies." *King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 394 (3d Cir. 2015) (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem Corp.*, 382 U.S. 172, 177 (1965)).  Because a party petitioning the government for redress is immune from antitrust liability under the *Noerr-Pennington* doctrine, the institution of patent infringement litigation generally cannot violate the antitrust laws.  *See PRE*, 508 U.S. at 56; *see also In re Wellbutrin XL Antitrust Litigation Indirect Purchaser Class*, 868 F.3d 132, 147-48 (3d Cir. 2017).

There are only two exceptions to that general rule, and they are narrow.  *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998); *see also In re Wellbutrin*, 868 F.3d at 147 ("A plaintiff claiming that a lawsuit is, by its very existence, anticompetitive and unlawful faces an uphill battle.").  The first exception is when the patent infringement litigation is a "sham."  *PRE*, 508 U.S. at 60-61.  Litigation is a sham, and therefore not immune from antitrust scrutiny, only when the antitrust plaintiff can establish that the patent infringement suit was both objectively baseless and brought with an improper subjective motivation.  *Id.*  The second exception requires the antitrust plaintiff to show that the asserted patent was obtained through fraud.  *See Walker Process*, 382 U.S. at 176-78; *Nobelpharma*, 141 F.3d at 1068.

In this case, the Complaint alleges that Align instituted "harassing" and "aggressive" patent suits against its competitors.  (D.I. 1 ¶¶ 64-66.)  But the Complaint does not allege that the suits were shams or that Align's patents were obtained by fraud.  Nor does it allege any facts that plausibly suggest either theory.  *See, e.g., Pac. Biosci. of Cal. v. Oxford Nanopore Techs., Inc.*, Nos. 17-275, 17-1353, 2019 WL 668843, *3-4 (D. Del. Feb. 19, 2019) (dismissing sham litigation and *Walker Process* claims when the complaint failed to plausibly allege improper subjective motivation or deceptive intent).

Because the Complaint fails to plausibly allege sham litigation or *Walker Process* fraud, Align's litigation activity is protected by *Noerr-Pennington* immunity and cannot by itself constitute anticompetitive conduct.

### B.  Unaccepted proposals

The next category of conduct alleged to be anticompetitive involves Align's proposals to enter into exclusive dealing arrangements with 3Shape.  The parties dispute whether Align's proposed arrangements would have been anticompetitive if consummated, but it is undisputed that 3Shape never agreed to them.

Conduct is not considered anticompetitive under Section 2 unless it has an anticompetitive effect.  *Dentsply*, 399 F.3d at 187; *Microsoft*, 253 F.3d at 58.  It follows that a mere offer to enter into a business deal—absent something more, like a threat that might affect the offeree's conduct—does not amount to anticompetitive conduct.

3Shape's allegations about Align's unaccepted proposals do not suggest a plausible harm to competition, nor has 3Shape explained how an unaccepted offer to enter into a business

11

arrangement could have resulted in any harm to competition.[5]  Accordingly, Align's proposals do not by themselves constitute anticompetitive conduct.[6]

## C.  Termination of the agreement with 3Shape

The third category of conduct alleged to be anticompetitive is Align's termination of its agreement to accept scans sent directly from 3Shape's Trios scanners.  (D.I. 1 ¶¶ 53-55.)  As explained above, a firm generally has no duty to cooperate with its rivals.  Firms can usually choose to do business with their rivals or they can choose not to, and they can change their minds.  *See linkLine*, 555 U.S. at 448 ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1198 (10th Cir. 2009) ("The antitrust laws should not be allowed to stifle a business's ability to experiment in how it operates, nor forbid it to change course upon discovering a preferable path.").  Thus, the mere termination of a contract with a rival, while potentially invoking contract remedies, does not constitute anticompetitive conduct.  *See, e.g., In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) ("The mere existence of a contractual duty to supply goods does not by itself give rise to an antitrust 'duty to deal.'");

---

[5] Nor has 3Shape explained how Align's offers, which 3Shape rejected, could have possibly resulted in any injury to 3Shape.  *See Brunswick Corp.*, 429 U.S. at 489 (requiring antitrust plaintiffs to prove injury "that flows from that which makes defendants' acts unlawful").

[6] 3Shape does not argue that Align's "attempt" to enter into an exclusive dealing arrangement qualifies as anticompetitive conduct that supports 3Shape's claim that Align "attempted monopolization" of the scanner market.  Which makes sense.  For one thing, the proposed arrangement would have kept 3Shape on the market.  *See Oxbow Carbon & Minerals LLC v. Union Pacific R. Co.*, 926 F. Supp. 2d 36, 46 (D.D.C. 2013) ("In enacting the prohibitions on monopolies, Congress was concerned about 'the complete domination of a market by a *single* economic entity,' and therefore did not include 'shared monopolies' or oligopolies within the purview of Section 2." (quoting *Sun Dun, Inc. of Washington v. Coca-Cola Co.*, 740 F. Supp. 381, 391 (D. Md. 1990))).  Nor did 3Shape suffer any injury as a result of Align's mere proposal.  *See* n.5, *supra*.

*Insight Equity A.P. X, LP v. Transitions Optical, Inc.*, No. 10-635, 2016 WL 3610155, at *13 (D. Del. July 1, 2016).

If there is any requirement that Align cooperate with 3Shape, it must fall under the narrow refusal to deal doctrine created by the Supreme Court in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). In that case, the plaintiff and defendant ski operators had previously cooperated to offer joint passes to both companies' mountains, until the defendant terminated the arrangement. *Id. at* 587–95. When the plaintiff tried to recreate the multi-mountain pass by offering to pay the defendant market price for its tickets, the defendant refused. *Id.* at 593–94.

The Supreme Court affirmed a jury verdict finding that the defendant's termination of the arrangement was anticompetitive and violated Section 2. While *Aspen* could be interpreted to require a competitor to continue to engage in a pre-existing course of dealing once it starts, the Supreme Court has since held that *Aspen* "is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. To proceed under the limited duty to deal exception created by *Aspen*, not only must the plaintiff show a pre-existing business relationship with the defendant, the circumstances surrounding the termination of that relationship must "suggest[] a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409.

In *Aspen*, the circumstances suggested that the preexisting joint ticket arrangement was profitable for the defendant, and the defendant was unwilling to renew the ticket even if compensated at its own retail price. 472 U.S. at 589-94; *Trinko*, 540 U.S. at 409. Those facts permitted an inference that the defendant acted solely to reduce the value of the plaintiff's ski mountain and force it to sell. *Trinko*, 540 U.S. at 409. In other words, the defendant's conduct was "irrational but for its anticompetitive effect." *Novell*, 731 F.3d at 1075; *see also* Areeda &

Hovencamp, *Antitrust Law* ¶ 772d3 (Supp. 2019) ("[B]efore a unilateral refusal to deal is unlawful under §2, the refusal must be 'irrational' in the sense that the defendant sacrificed an opportunity to make a profitable sale only because of the adverse impact the refusal would have on a rival.").

Limiting antitrust scrutiny of refusals to deal to circumstances where the defendant's conduct is economically irrational is potentially underinclusive, *i.e.*, it may allow some refusals to deal to evade antitrust scrutiny even when they actually have anticompetitive effects. *See Novell*, 731 F.3d at 1073, 1076. But the Supreme Court has concluded that the benefits of expanding the refusal to deal doctrine do not outweigh the costs, including (1) the risk of false positives, which may harm innovation, (2) the risk of collusion between companies forced to deal, (3) the inability of courts to supervise the terms and conditions of forced dealing, and (4) the absence of fair notice to business people. *linkLine*, 555 U.S. at 452-453; *Trinko*, 540 U.S. at 408, 414; *see also Novell*, 731 F.3d at 1076 ("If the [refusal to deal] doctrine fails to capture every nuance, if it must err still to some slight degree, perhaps it is better that it should err on the side of firm independence— given its demonstrated value to the competitive process and consumer welfare—than on the other side where we face the risk of inducing collusion and inviting judicial central planning.").

Because companies are generally free to choose with whom they deal, the only path forward for 3Shape's allegations about Align's termination of their agreement is under the refusal to deal doctrine. But 3Shape's allegations lack the essential feature of an anticompetitive refusal to deal. Assuming the parties' prior agreement was profitable for Align (as alleged in the Complaint), that does not by itself lead to a plausible inference that Align's termination of the agreement was economically irrational, as required by *Aspen*. Rather, Align's conduct, as alleged, is equally consistent with an inference that Align wanted to increase sales of its own scanner. *See Novell*, 731 F.3d at 1075 (explaining that a firm may choose to withdraw from a profitable course

of dealing for procompetitive reasons, such as when a firm desires "to pursue an innovative replacement product of its own," and that courts should look at profits across business lines to determine if conduct is economically irrational); *Viamedia, Inc. v. Comcast Corp.*, No. 16-5486, 2017 WL 698681, *5-6 (N.D. Ill. Feb. 22, 2017) (dismissing refusal to deal claim when complaint failed to plead facts plausibly suggesting that the defendants' conduct was economically irrational); *VBR Tours, LLC v. Yankee Leisure Grp., Inc.*, No. 14-00804, 2015 WL 5693735, *8-9 (N.D. Ill. Sept. 28, 2015) (same).

Because the Complaint does not plausibly allege circumstances invoking the refusal to deal doctrine, Align's termination of its agreement with 3Shape by itself is not anticompetitive.

### D. Introduction of the iTero Element scanner

The fourth category of conduct alleged to be anticompetitive covers Align's introduction of its iTero Element scanner in 2015.  (D.I. 1 ¶¶ 20-24.)  3Shape takes issue with the design of Align's iTero Element scanner, which is capable of sending scans directly to Align.  (*Id.* ¶¶ 22-23.)   If a dental professional desires to send a scan taken by the iTero Element to one of Align's competitors, the dental professional must take additional steps and pay a fee.  (*Id.* ¶ 23.)  In essence, 3Shape contends that Align should have designed its scanner to make it easier for dental professionals to order scans from Align's competitors.

That is just another refusal to deal claim. 3Shape is asking Align to deal with its rivals in the aligner market by designing its iTero Element scanner to send them business on favorable terms, namely, (1) directly from the scanner and (2) without charge to the user.  However, as already explained, "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *linkLine*, 555 U.S. at 448.

Once again, the only path forward for 3Shape is under the refusal to deal doctrine set forth in *Aspen Skiing*. But the Complaint here fails to plausibly allege the first requirement of *Aspen*: "a preexisting voluntary and presumably profitable course of dealing between the monopolist and the rival." *Novell*, 731 F.3d at 1074. Align never had a deal with its rivals in the aligner market governing the terms and conditions under which the iTero Element could be used to send them business.[7]

Absent a duty to deal, antitrust law does not require a firm to lend its competitors a helping hand. *See Novell*, 731 F.3d at 1072. Align's design of its iTero Element scanner by itself does not constitute anticompetitive conduct.

**E. Scanner discounts**

The final category of alleged anticompetitive conduct relates to Align's offering of price discounts on its scanners. The Complaint alleges that shortly after it terminated its agreement with 3Shape, Align offered current owners of 3Shape's Trios scanners a "steep" discount on Align's iTero Element scanner conditioned on the purchaser meeting a "target" number of Invisalign orders over a three-year period. (D.I. 1 ¶ 57.) The Complaint contains no further details about the size of the "steep" discount or the "target" number of orders. As alleged, Align's discount program is not an exclusive dealing arrangement, since the purchaser is not required to buy only Invisalign aligners.[8] It is not a traditional tying arrangement, since the scanner purchaser is not required to

---

[7] The Complaint does not allege that the design of Align's iTero Element scanner has ever changed. The Court is therefore not confronted with an allegation of anticompetitive product redesign.

[8] At oral argument, 3Shape's counsel suggested that Align's scanner discount program operated as a *de facto* exclusive dealing arrangement. (Tr. 25:9-26:22.) According to 3Shape's counsel, the "target" number of Invisalign orders was so high that a scanner purchaser was essentially unable to order any other types of aligners. The problem with that argument, which counsel acknowledged, is that the Complaint does not allege that fact. (*Id.*) Nor does it allege any

buy any Invisalign aligners at all; it only must do so if it wants the discount.   As pled, the arrangement is merely a price discount conditioned on the purchaser taking two of the seller's products.

Price discounts are generally not anticompetitive.  *linkLine*, 555 U.S. at 451; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986); *Philadelphia Taxi Ass'n*, 886 F.3d at 340 ("It is well established that lower prices, as long as they are not predatory, benefit consumers—'regardless of how those prices are set.'" (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990)).  That general rule has exceptions too.

The first exception is predatory pricing, which is when a monopolist prices its goods below cost in order to drive other competitors out of the market.   Once its competitors have been eliminated, the monopolist raises its prices to supracompetitive levels.

Actual predatory pricing schemes are rare, and firms who try them rarely succeed.  *Brooke Grp.*, 509 U.S. at 226; *Cargill, Inc. v. Monfort of Colo.*, 479 U.S. 104, 121 n.17 (1986).   And, "because cutting prices in order to increase business often is the very essence of competition[,] mistaken inferences are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Brooke Grp.*, 509 U.S. at 226 (internal marks omitted).  For these reasons, the predatory pricing exception to the rule protecting unilateral conduct is narrow, and it requires the antitrust plaintiff to show both (1) "that the prices complained of are below an appropriate measure of [the defendant's] costs"; and (2) that the defendant had "a dangerous probability[] of recouping its investment in below-cost prices." *Id.* at 222-24; *ZF Meritor*, 696 F.3d at 272.   The rule is underinclusive in the sense that it may not capture all anticompetitive pricing schemes.   But

---

facts about the size of the target number or, more importantly, its size in relation to a dental professional's total number of aligner orders.

a broader rule would allow "intolerable risks of chilling legitimate price-cutting." *Brooke Grp.*, 509 U.S. at 223.

3Shape's Complaint in this case does not allege predatory pricing. The Complaint contains no allegations about the cost of Align's scanner, or the amount of the discounts, other than to say they were "steep." (D.I. 1 ¶ 57.) Nor has 3Shape alleged that Align sold its scanners below cost. On that basis alone, 3Shape has failed to plausibly allege that the Align's scanner discounts were predatory. *See Varentec, Inc. v. Gridco, Inc.*, No. 16-217-RGA-MPT, 2017 WL 2438846, at *4-5 (D. Del. June 6, 2017) ("Without alleging plaintiff's actual costs, or industry standard costs, it is impossible to plausibly conclude that those alleged discounts resulted in below-cost pricing.").

The Third Circuit (but not the Supreme Court) has also recognized a bundled discount exception to the general rule protecting price discounts. A bundled discount is when a firm sells a bundle of goods for a lower price than the seller charges for the goods purchased individually. In *LePage's*, the Third Circuit held that bundled discounts can constitute anticompetitive conduct even when the predatory pricing test is not met (for example, because the goods are sold above cost). 324 F.3d at 154-157. Under the *LePage's* standard, the antitrust plaintiff must show that the effect of the discounts is to "foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer." *Id.* at 155. The *LePage's* standard for bundled discounts has not been adopted by any other Circuit, and it has not been expanded in the Third Circuit. *See Cascade Health Solutions v. Peacehealth*, 515 F.3d 883, 894-903, 908-09 (9th Cir. 2008) (discussing the controversy over *LePage's*). The Third Circuit has instructed courts to interpret *LePage's* narrowly in light of more recent Supreme Court precedent. *See ZF Meritor*, 696 F.3d at 274 n.11

(acknowledging the Supreme Court's recent emphasis on adherence to the predatory pricing test to assess the legality of price discounts).

In this case, 3Shape disclaims any reliance on a bundled discounts theory.  (Tr. 25:7-13.) Even if I were to analyze Align's conduct as a bundled discount, the facts alleged in the Complaint do not satisfy the standard set forth in *LePage's*.  The Complaint fails to allege facts permitting a plausible inference that 3Shape was unable to offer a comparable discount on its own scanners. Nor has 3Shape explained how the discounting program could have plausibly foreclosed it from the scanner market, as required by *LePage's*, because the program was restricted to dental professionals who had already purchased 3Shape's scanner.  The Third Circuit has instructed lower courts not to extend *LePage's*, and I see no basis to do so on the limited allegations here.

In sum, 3Shape has failed to allege that Align's scanner discount program was itself anticompetitive.

### F.  Anticompetitive scheme

Not so fast, says 3Shape: Align's acts viewed individually may not be anticompetitive, but they must be examined together.   And when they are, 3Shape argues, they demonstrate an anticompetitive scheme cognizable under Section 2.

The case law is replete with language that appears to support 3Shape's argument.  The Supreme Court, for example, has stated that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."  *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).  Likewise, the Third Circuit has stated that "courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation."  *LePage's*, 324 F.3d at 162.

Read in context, however, those statements stand for the proposition that courts must look at anticompetitive acts in combination to assess their anticompetitive effect. Those cases do not hold that unilateral acts otherwise insulated from antitrust scrutiny can be pled together to state a Section 2 violation. *Continental Ore* involved an exclusive dealing conspiracy, not unilateral conduct. 370 U.S. 698-99. *LePage's* dealt with an anticompetitive bundled discount arrangement. 324 F.3d at 158.

The other cases cited by 3Shape do not address the circumstances here either. In *Rochester Drug Coop. v. Braintree Laboratories*, the plaintiff alleged sham litigation, which is recognized anticompetitive conduct. 712 F. Supp. 2d 308, 318-19 (D. Del. May 19, 2010). Likewise in *In re Gabapentin Patent Litigation*, 649 F. Supp. 2d 340, 361-65 (D.N.J. 2009) and *In re Neurontin Antitrust Litigation*, No. 02-1830, 2009 WL 2751029, *13 (D.N.J. Aug. 28, 2009). In *In re Remeron Antitrust Litigation*, the Court concluded that the complaint alleged standalone anticompetitive conduct in addition to an overall scheme. 335 F. Supp. 2d 522, 528 (D.N.J. 2004) (stating that the court was "reserv[ing] judgment" on the viability of the scheme claim). In *Microsoft Mobile Inc. v. Interdigital, Inc.*, the plaintiff alleged the type of bad faith conduct that was recognized as anticompetitive in *Broadcom*. No. 15-723, 2016 WL 8302609, *2 (D. Del. Apr. 13, 2016). In *American Tobacco Co. v. United States*, the Supreme Court affirmed a Section 2 violation based on a conspiracy, not unilateral conduct. 328 U.S. 781, 809 (1946). The monopolization claim in *West Penn Allegheny Health Systems* also involved a conspiracy. 627 F.3d at 109.

As 3Shape has not pointed to any controlling authority, this question remains: can (1) patent litigation activity that does not satisfy the sham litigation or *Walker Process* rules, (2) an unaccepted offer to enter into a business deal that had no effect on the market, (3) refusals to deal

that do not satisfy the *Aspen Skiing* rule, and (4) price discounts that don't meet the *Brooke Group* predatory pricing rules or invoke the circumstances of *LePage's*, all be combined to state an antitrust claim? The Supreme Court's analysis in *linkLine* suggests that the answer is no.

In *linkLine*, the Supreme Court considered whether antitrust plaintiffs could state a monopolization claim under a "price-squeeze" theory that consisted of two types of conduct otherwise protected from antitrust scrutiny. In that case, the defendant operated in two markets: it sold services to consumers in the retail market; and it sold wholesale services to its retail competitors. *linkLine*, 555 U.S. at 442-43. The plaintiffs, competitors in the retail market, alleged that the defendant charged them a high wholesale price and simultaneously charged consumers a low retail price. Because the plaintiffs had to match the defendant's low retail price to make sales, the plaintiffs argued that the defendants set the wholesale and retail prices to "squeeze" the plaintiffs' profit margins and force them to out of business. *Id.* at 443-44.

The Supreme Court rejected the plaintiffs' monopolization claim, reasoning that the allegations were essentially an amalgamation of two claims—the defendant's refusal to deal with its competitors at the wholesale level and the defendant's low pricing at the retail level—both of which are theories of anticompetitive conduct for which the Supreme Court has set forth specific legal rules. *Id.* at 448-52. Applying the refusal to deal rule set forth in *Aspen* and *Trinko* and the predatory pricing rule set forth in *Brooke Group*, the Supreme Court concluded that the plaintiffs' complaint stated neither type of claim. *Id.* at 452. Consequently, the Supreme Court refused to recognize the "price squeeze" claim, reasoning that "[t]wo wrong claims do not make one that is right." *Id.* at 457. In so doing, the Supreme Court acknowledged "the importance of clear rules in antitrust law[,]" noting specifically the inability of courts to supervise generalized duties to deal, the risk of chilling price discounts, and the need to provide guidance to businesses. *Id.* at 452-53.

Although *linkLine* was framed as a "price-squeeze" claim, the plaintiffs in that case could have just as easily characterized it as a scheme of anticompetitive conduct consisting of a refusal to deal and price discounting.  *linkLine*, however, is consistent with the proposition that, when there are developed legal rules that restrict when otherwise-protected conduct can be scrutinized under the antitrust laws, an antitrust plaintiff must satisfy at least one of those rules in order to proceed under a theory that the combined conduct is anticompetitive.[9]

Just as the rules governing refusal to deal claims and pricing claims are underinclusive in capturing conduct with anticompetitive effects, as explained above, so too is a rule requiring an antitrust plaintiff to plead more than just unilateral conduct that is otherwise protected from antitrust scrutiny.  It could be the case that a defendant's refusals to deal with its competitors, combined with its patent litigation and its offering of above-cost discounts in fact has an adverse effect on competition, as 3Shape contends here.  But the Supreme Court's rules governing those types of conduct are not based on its determination that they could never harm competition.  The rules are based on other considerations, including First Amendment rights, the risk of false positives, the inability of courts to administer forced dealing, and the need to give fair notice to businesses.  *linkLine*, 555 U.S. at 452-453, 455; *Trinko*, 540 U.S. at 408, 414; *PRE*, 508 U.S. at 56 *Brooke Grp.*, 509 U.S. at 223; *see also* Daniel Crane, *Does Monopoly Broth Make Bad Soup?*, 76 Antitrust L.J. 663, 668 (2010) ("To reduce all monopolization law to a case-by-case inquiry on whether the sum of the defendant's conduct harms competition is to miss a much more complex

---

[9] The question of whether non-sham patent litigation can support a claim of an overall scheme to monopolize when the there are other alleged instances of anticompetitive conduct does not need to be addressed here, since the Complaint does not allege any other anticompetitive conduct.  For the same reason, the Court need not answer the related question of whether unilateral conduct otherwise insulated from antitrust review can be combined with anticompetitive conduct when analyzing an antitrust scheme claim.

set of policy and juridical inputs into monopolization law and to create excessive uncertainty in adjudication.").

A rule requiring plaintiffs to plead at least one instance of conduct not otherwise insulated from antitrust scrutiny is also consistent with the approach taken by other courts. *See, e.g., Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 486 Fed. Appx. 186, 191 (2d Cir. 2012) (affirming dismissal of an antitrust scheme claim; "[b]ecause these alleged instances of misconduct are not independently anti-competitive, we conclude that they are not cumulatively anti-competitive either"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503-DJC, 2015 WL 5458570, at *12 (D. Mass. Sept. 16, 2015) (concluding that a complaint failed to state a Section 2 claim under an "overarching scheme" theory when none of the alleged conduct was independently anticompetitive); *In re Lipitor Antitrust Litig.*, No. 13-2389, 2013 WL 4780496, *23 (D.N.J. Sept. 5, 2013) ("Having already determined that all of the specific allegations of conduct in violation of Section 2 . . . are meritless and insufficient to state a claim for relief, the Court finds that a claim based on the purported 'combined' impact of Plaintiffs' claims is also without merit."); *cf. Valassis Comm'ns, Inc. v. News Corp.*, No-17-7378 (PKC), 2019 WL 802093, *9-10 (S.D.N.Y. Feb. 21, 2019) (price discounts not anticompetitive by themselves could not be considered as part of an antitrust scheme claim).

In short, two wrong claims did not make a right in *linkLine* and five wrong claims do not make a right here. 3Shape's contention that Align engaged in a scheme consisting of acts otherwise insulated from antitrust scrutiny is insufficient to allege anticompetitive conduct under Section 2.

As 3Shape's failure to plead anticompetitive conduct fully supports granting Align's motion to dismiss, the Court need not decide whether the other grounds raised by Align (lack of standing[10] and failure to allege relevant product markets) would also support dismissal.

## IV. CONCLUSION

For the reasons set forth above, 3Shape's Complaint fails to plausibly allege anticompetitive conduct, a required element of monopolization and attempted monopolization under Section 2 of the Sherman Act. I recommend that Align's motion be GRANTED, that the Complaint be DISMISSED without prejudice, and that 3Shape be granted leave to amend the Complaint within 21 days.[11]

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B),(C), Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1. Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages. Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.

---

[10] Antitrust standing is a prudential limitation. As it does not affect subject matter jurisdiction, there is no requirement that the Court consider it at this time. *See Shionogi Pharma, Inc. v. Mylan, Inc.*, No. 10-1077, 2011 WL 2174499, *3 (D. Del. May 26, 2011) (dismissing Section 2 claim for failure to state a claim without addressing the parties' dispute over antitrust standing).

[11] Align requests that the Complaint be dismissed without leave to amend because any amendment would be futile. However, it is not clear on this limited record that amendment would necessarily be futile. *See Alston v. Parker*, 363 F.3d 229, 235-36 (3d Cir. 2004) (holding that leave to amend should be granted "unless a curative amendment would be inequitable, futile, or untimely").

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated October 9, 2013, a copy of which can be found on the Court's website.


Dated: August 15, 2019

_____
Jennifer L. Hall
UNITED STATES MAGISTRATE JUDGE