## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| 3SHAPE TRIOS A/S, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1332-LPS |
| | ) | |
| ALIGN TECHNOLOGY, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT

Plaintiff 3Shape Trios A/S, by and through its undersigned counsel, states as follows for its Amended Complaint against Defendant Align Technology, Inc.:

## NATURE OF THE ACTION

1.     Plaintiff 3Shape Trios A/S ("3Shape") brings this lawsuit to restore competition in two separate but related markets in the United States: the market for custom-manufactured removable dental aligners made of clear plastic that correct teeth misalignment ("Clear Aligners") and the market for digital intraoral scanners used by dental professionals to generate full mouth scans to order these aligners ("Scanners For Orthodontic Treatment").

2.     Defendant Align Technology, Inc. ("Align") is the dominant producer of Clear Aligners, with control of over 90 percent of the market.  Align earns well over a billion dollars per year selling its Invisalign® Clear Aligner product at high prices, with gross margins typically in excess of 75 percent.

3.     Align also manufactures a Scanner For Orthodontic Treatment called iTero, which is becoming the dominant scanner for in the Market For Scanners For Orthodontic Treatment.

4. In both markets, Align is using its dominant position to stifle competition and crush rivals and would-be entrants. That conduct is harming customers and competitors in both markets.

5. Until October 2017, Align maintained its dominance in the Market For Clear Aligners by aggressively deploying its patent portfolio against potential competitors. Since then, with its patents already expired or slated to expire soon, Align turned to anticompetitive conduct to preserve its Clear Aligner dominance in the face of pressure from rival manufacturers.

6. As detailed in this Amended Complaint, Align engaged in extensive unlawful exclusive dealings with dental providers and other anticompetitive conduct. That conduct was designed and intended to maintain and enhance Align's monopoly power in the Market For Clear Aligners and to gain monopoly power in the Market For Scanners For Orthodontic Treatment.

7. Align's conduct was also intended to cut off its Clear Aligner rivals' access to their dental professional customers by entrenching Align's exclusionary, *de facto* closed iTero scanner operating system in the Market For Scanners For Orthodontic Treatment. Align's conduct in the Market For Scanners For Orthodontic Treatment was the means by which Align accomplished its anticompetitive ends in the Market For Clear Aligners.

8. As Align has repeatedly emphasized, dental professionals require a fast and accurate way to scan patients' full mouths—the upper and lower jaws, teeth and bite—and to transfer that scan to a Clear Aligner manufacturer. There are only two viable scanners for this purpose: 3Shape's TRIOS® scanner and Align's iTero® scanner.

9. One of the principal differences between the iTero and the TRIOS scanners is that TRIOS provides an open, integrated digital system that dental professionals can use to order Clear Aligners from either Align *or* its competitors.

2

10.     iTero, on the other hand, is a *de facto* closed system that excludes Align's rivals in the Clear Aligner Market by imposing insurmountable additional costs and burdens on dental professionals who otherwise would order Clear Aligners from one of Align's rival manufacturers.  Thus, the sale of more iTero scanners necessarily increases sales of Invisalign.

11.     The crux of Align's anticompetitive scheme is to contractually commit dental professionals into purchasing and using only the iTero *de facto* closed-system scanner, and thereby prevent other Clear Aligner manufacturers from challenging Align's dominant position in the Market For Clear Aligners, enhancing Align's monopoly power in the Market For Clear Aligners and enabling it to gain monopoly power in the Market For Scanners For Orthodontic Treatment.

12.     Align is succeeding in that scheme, which an investment analyst has described as creating a "digital moat" that protects Align from competition, through the following anticompetitive conduct:

(a)     Multi-year exclusive contracts with large Dental Service Organizations ("DSOs") characterized by terms that effectively prevent those professionals from dealing with other Scanners For Orthodontic Treatment or Clear Aligner manufacturers.

(b)     The so-called "Fusion Program," which locked dental professionals into Align's system through a *de facto* exclusive promotion that bundled the sale of an iTero scanner with the sale of a minimum number of Invisalign orders, which prevented dental professionals from ordering competing Clear Aligner and thus foreclosed competition from Align's competitors.

(c)     The so-called Invisalign "Advantage Program," which forecloses competing Scanners For Orthodontic Treatment (and, as a result, competing Clear Aligners) by

3

forcing dental professionals to agree to use iTero to obtain the discounts on Invisalign that they need to compete to provide Clear Aligners to their patients.

13.     In addition, Align used 3Shape's TRIOS customer list—in blatant violation of confidentiality provisions governing Align's access to that information—to target those customers to purchase iTero scanners.

14.     Align's scheme directly targeted 3Shape's TRIOS scanner.  As long as dental professionals had access to the TRIOS scanner, they also had access to Align's Clear Aligner rivals, and were in a better position to resist Align's exclusive—and exclusionary—terms.

15.     To keep Clear Aligner competitors out of the Market For Clear Aligners, Align acted against its own interest (if the market were competitive) by terminating an interoperability agreement with 3Shape (the "Scanner Agreement") that was profitable for Align.

16.     Under the Scanner Agreement, 3Shape was certified by Align to send digital scans from 3Shape's TRIOS to Align for Invisalign orders.  In terminating the Scanner Agreement, Align sacrificed significant near-term profits and customer goodwill to maintain and enhance its monopoly power in the Market For Clear Aligners and gain monopoly power in the Market For Scanners For Orthodontic Treatment.

17.     Align's anticompetitive scheme is working.  It has effectively shut 3Shape out of the United States Market For Scanners For Orthodontic Treatment, while it has simultaneously boosted sales of its iTero scanner.  As a result, Align is succeeding in its attempt to monopolize the Market For Scanners For Orthodontic Treatment.

18.     Align is also succeeding in maintaining its monopoly grip on the Clear Aligner Market, even without patent protection.  By shutting 3Shape out of the Market For Orthodontic Treatment, Align has cut off its Clear Aligner rivals' access to the dental professionals who order

Clear Aligners.  As evidence of its continued monopoly power, in the wake of multiple new entrants into the Clear Aligner Market by major dental companies, Align was able to ***raise its Clear Aligner prices in July 2019***—not lower them—at a time when competition should have caused decreased prices.

19.     Injuring 3Shape was the very means by which Align could attack its Clear Aligner competitors and achieve its anticompetitive ends.  3Shape's injury was necessary to Align's continued monopoly power, because without it, Align could not have excluded rival Clear Aligner manufacturers and maintained its monopoly share of the Market For Clear Aligners.

## JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 117, and Section 4 of the Clayton Act, 15 U.S.C. § 15, because 3Shape brings these civil antitrust claims under Section 2 of the Sherman Act, 15 U.S.C. § 2.

21.     The Court has personal jurisdiction over Defendant because Defendant (a) has consented to personal jurisdiction of this Court in connection with its patent infringement lawsuits against 3Shape, (b) transacted business in this judicial district, (c) directly sold its Clear Aligners and its iTero scanners in this judicial district as well as in interstate trade and commerce, (d) has substantial contacts with this judicial district, and (e) has engaged in the alleged wrongful conduct in this judicial district.

22.     Venue is proper in this judicial district under Section 4 of the Clayton Act, 15 U.S.C. §§ 15, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) and (c), because Defendant, a Delaware corporation, resides in this judicial district, Defendant transacts business in this judicial district, and during all relevant times, a substantial part of the events or omissions giving rise to these civil antitrust claims occurred in this judicial district.

23.     The conduct complained of herein has occurred in and had a substantial effect on interstate trade and commerce.

## THE PARTIES

24.     3Shape is incorporated in Denmark with its principal place of business at Holmens Kanal 7, 1060 Copenhagen, Denmark.  3Shape has a United States sister corporation, 3Shape Inc., which is incorporated in Delaware with its principal place of business in Warren, New Jersey.  3Shape Inc. provides marketing, warranty and repair services for 3Shape's products and supports 3Shape's third party United States resellers/distributors.

25.     Align is incorporated in Delaware, with its principal place of business at 2820 Orchard Parkway, San Jose, California.

## FACTS

### *Align Possesses Monopoly Power in the Market For Clear Aligners*

26.     Align is the dominant producer of Clear Aligners in the United States, and its Invisalign product has become the catch-all term for Clear Aligners.

27.     Align manufactures and sells at least 90 percent of all Clear Aligners sold in the United States.  Indeed, as estimated by a well-known investment analyst company, Align has enjoyed unfettered dominance in the Market For Clear Aligners in the United States, "maintain[ing] a dominating 90%+ share of the 1B+ clear aligner orthodontic market."  Its largest competitor, Clear Correct, has less than 10 percent market share.

28.     Align markets Invisalign to dental professionals, including both orthodontists and general practice dentists, who prescribe Clear Aligners to patients by placing a custom order for the product from Align or a competing Clear Aligner manufacturer.

29.     Despite efforts by multiple sophisticated companies to enter the Market For Clear

6

Aligners,[1] no other company has been able to gain meaningful market share, and Align's revenues from Invisalign continue to increase and its high margins persist.  In its third quarter 2019 earnings report, Align reported a 20.7 percent increase year-over-year for its Clear Aligner segment in case shipments with revenues of $516.3 million and a 20.2 percent increase in net revenue year-over-year.  Invisalign gross margins typically exceed 75 percent.

30.     Similarly, and again despite these new entrants, Align reported in its earnings release for the third quarter of 2019 that utilization of Invisalign among North American orthodontists and dentists was at an all-time high.

### The Expiration of Align's Invisalign Patents Threatened Align's Dominant Position in the Clear Aligner Market

31.     Invisalign's rapid and early adoption following its first commercial sales in 1999 gave Align an entrenched position in the new Market For Clear Aligners, defended by Align's Clear Aligner patents, which provided it with a substantial lead over potential competitors.

32.     Align aggressively deployed its patents by instituting patent and trade proceedings against its Clear Aligner competitors—for example, it brought such proceedings against OrthoClear, SmileDirectClub, ClearCorrect, and OrthoCaps.

33.     Align's key patents covering the design and manufacturing of Invisalign expired in October 2017.  Many of Align's remaining patents relating to Invisalign will expire by the end of 2019, with additional patents expiring each subsequent year.

34.     Align had previously informed the investment community that Invisalign's success depended on maintaining and enforcing its patents.  From 2013 to 2015, Align's 10-K SEC filings stated that they "intend to rely on [their] portfolio of issued and pending patent

---

[1] *See infra.* at ¶129.

applications in the U.S. and in other countries to protect a large part of [their] intellectual property and [their] competitive position."

35.     When the expiration period was less than twelve months away, Align sent a new message to investors:  "When patents expire, we lose the protection and competitive advantages they provided to us, which could negatively impact our operating results."  In other words, Align recognized that maintaining its dominant position would require a different strategy.

36.     Align also recognized the near certainty of new competitors in the Clear Aligner Market as its key patents approached expiration.  Beginning in 2013, Align began disclosing in its SEC filings that "expiration of key certain patents commencing in 2017 owned by us may result in additional competition."

37.     Faced with this prospect of increased competition, Align did not do what any company in a competitive market should do—improve its products and lower prices.  Instead, armed with its dominant Clear Aligner Market position, it took anticompetitive steps to maintain its dominance in the Market For Clear Aligners, increase its dominance in the Market For Scanners For Orthodontic Treatment, and exclude its current and would-be rivals in both markets.

### Align's iTero Scanner is a De Facto Closed System that Builds a Protective "Moat" Around Invisalign

38.     Align's anticompetitive conduct focused on securing agreements with orthodontists and dentists to use the iTero scanner—its own closed proprietary scanner—and thereby exclude its Clear Aligner rivals.

39.     In September 2015, Align began selling its iTero Element®, a Scanner for Orthodontic Treatment, which had exclusive integration with Invisalign treatment application, including Align's Invisalign Outcome Simulator.  iTero's exclusive integration into Invisalign's

workflow process thus allowed for a "gateway for ALIGN's vision" of driving Invisalign utilization and accompanying sales, according to Yuval Shaked, Align's Senior Vice President & Managing Director.

40.     Scanners For Orthodontic Treatment are essential to dental professionals offering Clear Aligners to their patients and are essential to effective sales of Clear Aligners by dental professionals.

41.     Dental practices typically do not purchase more than one Scanner For Orthodontic Treatment because they cannot afford more than one scanner due to the capital investment and/or unwillingness to invest in the necessary training.  If a dental practice can afford more than one scanner, that practice tends to use only one brand due to the cost of maintaining multiple software subscriptions,[2] and the time and expense to train personnel to use multiple scanners and software.

42.     Like most capital investments, a new scanner is purchased to last several years. Most dental offices expect to use their scanner from three to five years.

43.     Align knows this, which is why as Align's patent protection is ending, it is using its market power in the Market For Clear Aligners to engage in anticompetitive conduct (including exclusive agreements, as described below) to force dental practitioners to purchase its iTero scanner.  A dental professional that purchases an iTero scanner, with its closed system integration with Invisalign, becomes an exclusive Invisalign provider for at least three years.

44.     By engaging in this conduct, Align is driving sales of its Invisalign aligners, and eliminating the ability of its Clear Aligner rivals to compete, because iTero cannot send scans outside of the *de facto* closed Align ecosystem.

---

[2] Scanner subscriptions can run several thousand dollars per year.

45.     An investment analyst recently described Align's closed ecosystem as the "digital moat" protecting Invisalign from competition.  Align's President and CEO Joseph M. Hogan ("Hogan") recognized as much, including recently stating on a Bloomberg Television interview that "Align Technologies isn't too worried about competition."

46.     The creation of that protective moat, combined with Align's other anticompetitive conduct described below, has prevented other Clear Aligner manufacturers from effectively challenging Align's dominant position in that market.  It has interfered with competition in both the Market For Clear Aligners and also in the related Market For Scanners For Orthodontic Treatment.

### *Align's Multi-Year Exclusive Contracts with Major Dental Service Organizations Have Foreclosed Competition in the Market For Clear Aligners and in the Market For Scanners For Orthodontic Treatment*

47.     By entering into multi-year exclusive contracts for the sale of iTero scanners with major DSOs, Align has effectively required hundreds of dental professionals in these DSOs to order Invisalign instead of competing Clear Aligners.

48.     DSO members are bound by the purchase decisions of the DSO; as a result, DSOs are an important "strategic part of [Align's] overall strategy," and were a significant factor in Align's 2018 "[r]ecord Q4 volumes."

49.     As of mid-2018 (following termination of interoperability with 3Shape), Align had become the dominant provider of Scanners For Orthodontic Treatment to DSOs (and, as a result, the dominant provider of Clear Aligners to their members).

50.     In line with its "Fusion Program," described below, Align dramatically dropped the price of the iTero to major DSOs in exchange for multi-year Invisalign order commitments. Those commitments, on information and belief, could be achieved only if a DSO sent Clear

Aligner scans exclusively to Align, and not its Clear Aligner competitors.  As a result, sales of iTero scanners to DSOs increased dramatically, and sales of Invisalign were accordingly higher than they would have been absent these *de facto* exclusive agreements.

51.     On July 25, 2018, Align announced a multi-year deal with Heartland Dental, the nation's largest DSO with more than 850 supported dental offices, to place iTero scanners in member dental offices, under a timeline that would place iTero in 90 percent of supported offices nationwide by the end of the year.  As a result of the deal, Heartland Dental purchased 900 iTero scanners in 2018.

52.     The Heartland "endeavor represent[ed] the industry's single-largest scanner deployment."

53.     On July 25, 2018, Align announced that it had also secured a deal with Aspen Dental, the nation's largest branded DSO with nearly 700 locations, to equip all Aspen locations with iTero scanners.

54.     3Shape bid for the Aspen Dental contract and its TRIOS scanner scored the highest in Aspen Dental's evaluations.  However, Aspen Dental informed 3Shape that it did not select the TRIOS scanner because Align did not permit it to interoperate with Invisalign.  In other words, because of Align's dominant position in the Market For Clear Aligners, Aspen Dental was forced to select a less desirable scanner.

55.     These DSO contracts have enabled Align to rapidly increase its market share in the Market For Scanners For Orthodontic Treatment and maintain its monopoly in the Clear Aligner Market.  Align reported an 84 percent growth in its scanner sales in North America in the first quarter of 2018.  And in Q3 2018, Align saw "strong volume growth from the Dental Service Organizations (DSOs) channel which increased over 40% Y/Y in Q3."

***Align Implemented the "Fusion Program" to Lock Dental Professionals into Its
De Facto Closed System.***

56.      In late 2017, Align launched the Fusion Program, a bundled pricing mechanism for iTero that further entrenched its dominance in the Clear Aligner Market and further enhanced its market position in the Scanner Market.

57.      Under the Fusion Program, the price of the iTero Scanner depended on the dental professional's number of Invisalign cases.  Failure to meet a minimum threshold of Invisalign cases each year for a three-year period resulted in substantial annual back-end penalties.

58.      The minimum threshold met or exceeded the average dental professional's anticipated *total* number of annual Clear Aligner cases.  In particular, the average utilization rate for dental professionals has never exceeded four cases per year, and the penalties were triggered by failing to achieve 12, 16, and 20 Invisalign cases in each successive year.

59.      Align set these targets in a manner which forced the dental professionals to either stop sending cases to Align's competitors, or trigger the penalties.

60.      The back-end penalties could total $10,000 over three years, or 30 percent or more of the cost of the iTero scanner.

61.      A dental professional that incurred these penalties could not compete effectively to sell Clear Aligners against other dental professionals that avoided these penalties.  And given Align's dominant position in the Market For Clear Aligners, that dental professional could not avoid these penalties by foregoing Invisalign orders at all.

62.      Thus, the effect of this product bundle—including its minimums and penalties—is that dental professionals are foreclosed from ordering Clear Aligners from Align's rivals, displacing those competitors entirely, or drastically reducing purchases from those companies.

63.     The purpose and effect of Align's bundling was confirmed by expert commentary, which described the Fusion Program as "a not-so-subtle effort on the part of management to lock these customers in for a fairly long time, in our view, just as Clear Aligner competition is likely set to rise over the next 3-6+ months."

64.     As analysts recognized, 3Shape could not compete effectively against Align's bundled offering.  Absent the bundled pricing, the TRIOS and iTero scanners were sold at similar list prices.  In the bundle, however, the effective price of the iTero was $10,000 cheaper (as reflected in the penalty provisions of the program).  Thus, as one analyst explained, 3Shape's TRIOS "was one of the top (if not top) selling chair-side digital impression systems in the domestic market and typically sells for closer to $30,000.  While 3Shape could also drop its TRIOS pricing to compete with a $19,999 iTero price, 3Shape would have to take the full hit of losing a third of its revenue in such a deal, whereas ALIGN can make its lost iTero revenue up with the sale of just a couple Full or several E5/E10 Invisalign cases."

### Align Overhauled Its Invisalign Advantage Program to Coerce Dental Professionals into Using iTero

65.     Until the end of 2017, Align's discount program for Invisalign ("Advantage Program") allowed dental professionals to gain discounts based on the total number of Invisalign cases submitted by that provider over time.

66.     Dental professionals in the highest tiers received the most lucrative discounts.

67.     Under the Advantage Program, once a dental professional achieved the highest tier ranking, that dental professional retained that ranking (and the associated discounts) for Invisalign orders moving forward.

68.     In January 2018, days before cutting off interoperability with 3Shape's TRIOS scanner, Align rolled out revisions to the Advantage Program that eliminated consideration of

lifetime cases, and instead based discounts solely on the number of cases submitted by a dental professional in the previous six months.

69.     These changes required providers to submit a consistently high number of Invisalign cases to achieve the most preferential pricing, regardless of historical purchase volume, or risk losing the discounts that are necessary for dental professionals to be able to compete to sell Clear Aligners to their patients.  The discounts can affect a dental professional's margins by 30 percent or more, and a dental professional without access to such significant discounts cannot compete effectively with a dental professional that receives these discounts.

70.     The only way for dental professionals to achieve the highest discount levels is to purchase and use an iTero scanner.  Since no other scanner with full mouth scanning capabilities has interoperability with Invisalign, the iTero is now the only viable scanner to send Clear Aligner scans to Align.

71.     Thus, Align's Advantage program has caused dental professionals to displace 3Shape's TRIOS entirely, or in some cases, drastically reduce purchases from 3Shape.  Align set discount targets in a manner which forced dental professionals to either stop purchasing and/or using TRIOS, or lose the maximum rebate.  As a result, to qualify for the maximum rebate, dental professionals have diverted business to iTero.

72.     In short, Align's changes to its Advantage Program created *de facto* exclusivity by requiring dental professionals to use iTero scanners to be able to qualify for the "all-or-nothing" discounts, which have led dental professionals to maximize their discounts by dealing exclusively with Align, or suffer meaningful penalties in the form of lost discounts, significantly impeding their ability to compete.

***Because 3Shape's TRIOS Scanner is Technologically Superior to the iTero
Scanner and Allows for an Open Ecosystem, 3Shape Threatened Align's
Dominance in Both Markets***

73.     3Shape is a pioneer developer of dental equipment and software for use by dental
professionals and laboratories since 2004.  In particular, 3Shape designs, develops,
manufactures, and sells TRIOS, the first color, wireless intraoral full mouth scanner in the
industry, and software products.  The TRIOS system can be used for scanning, designing and
ordering of Clear Aligners and a number of other orthodontic treatments or dental products.

74.     TRIOS has been named the best intraoral scanner by the industry for five years in
a row.  TRIOS was also named the most accurate intraoral scanner in an independent American
Dental Association study.

75.     Align agrees that TRIOS is a high-quality scanner.  Its Chief Marketing Officer,
Raphael Pascaud, testified in the 1091 ITC proceeding on September 21, 2018 that TRIOS
scanners are "great" and are well regarded because of their technology, including their scanning
accuracy and precision.

76.     TRIOS has numerous operational advantages for dental professionals.  The most
important is that TRIOS is an open system scanner, integrated with many different providers of
restorative products and orthodontic treatments.  This open system provides patients and dental
professionals' freedom of choice and access to an open market for dental and orthodontic
treatments.

77.     Dental professionals can send scans directly from TRIOS via 3Shape's cloud
software to any third-party provider that accepts the open industry standard file format—for
example, ClearCorrect and Orthocaps.  TRIOS also offers CAD integration, allowing for 3D
printing in-office by dental professionals.

78.     As Align's then-Chief Operating Officer told analysts in an April 23, 2015

15

investor call (when its Clear Aligner market dominance was protected by patents), such open systems

> are better for our customers.  No one wants to have to redesign, start over, buy multiple pieces of equipment if they can have greatest utility from a scanner… So, we believe what we hear from our customers is they don't want to be forced to buy a system from you for the pleasure of offering Invisalign to their patients and other therapies we may have down the road. So we feel actually very strongly . . . .  There's no reason for us not to act in complementary ways because it's good for the customer.  So in our minds, we don't need to own the channel.  We don't need to have exclusivity. In fact, we want probably more high-quality scanners that can make it easier to do Invisalign and other chair-side procedures that we have the unique capabilities to fulfill.

79.     By late 2017, Align was acting contrary to those same customer interests.  That is because 3Shape's TRIOS scanner represented a major roadblock to Align maintaining its dominance in the Market For Clear Aligners.  As long as dental professionals had access to the TRIOS scanner, they also had access to Align's Clear Aligner rivals, and thus were in a better position to resist Align's exclusive—and exclusionary—terms.  Accordingly, Align took multiple steps to exclude the TRIOS scanner.

### *Align and 3Shape Entered into a Business Relationship So Align Could Increase Invisalign Sales by Accessing 3Shape's Network of Dental Professionals Using TRIOS Scanners*

80.     In December 2015, Align and 3Shape entered into the Scanner Agreement, under which the parties worked together to build an interface so that dental professionals could send TRIOS scans into Align's Invisalign work flow.

81.     Align entered into the Scanner Agreement to increase Invisalign sales, as Pascaud explained in testimony in one of the ITC matters.  Align also entered into the Scanner Agreement to access the broad group of dental practitioners using 3Shape's technologically superior TRIOS.

82.     Before the Scanner Agreement was executed—and notwithstanding what Align

16

was stating publicly at the time about the advantages to customers of open interoperability—Align attempted to force 3Shape to agree to exclusivity in order to grant interoperability.  That would have meant that TRIOS scanners could be used only to order Invisalign Clear Aligners as a condition of interoperability with Align's system.  Align also did not want 3Shape to promote or offer alternative software capable of staging Clear Aligner treatments.

83.     3Shape refused Align's demands for exclusivity.  3Shape had existing business relationships with two of Align's aspiring competitors:  ClearCorrect and Specialty Appliances.  And 3Shape was in the process of developing software capable of staging Clear Aligner treatments (Treatment Simulator).

84.     Exclusivity is also contrary to 3Shape's philosophy of maintaining an open ecosystem in which scans from TRIOS scanners can be sent to all manufacturers of Clear Aligners, not just Align.

85.     After negotiation, Align ultimately dropped its exclusivity demand, and 3Shape and Align entered into the Scanner Agreement.  The agreement expressly permitted 3Shape to provide scans to other Clear Aligner manufacturers as well as to continue to promote and offer its software.

### During the Business Relationship with 3Shape, Align Became Concerned about 3Shape's Open Ecosystem and Competition in the Market For Clear Aligners So Align Began Undertaking Anticompetitive Conduct Designed to Foreclose 3Shape from the Market For Scanners For Orthodontic Treatment

86.     During the business relationship with 3Shape, Align's Hogan increasingly became concerned that the increase in the popularity of the TRIOS scanner among dental professionals would lead to those dental professionals to order Clear Aligners from Align's rivals instead of Invisalign.

87.     In February 2016, at a meeting between Align and 3Shape, Align made clear that,

17

as part of any further collaboration between the companies, 3Shape would need to treat Invisalign as the "preferred partner" for Clear Aligners. Align was represented at this meeting by Hogan and Pascaud.

88.     At a meeting between the parties in November 2016, Pascaud wanted 3Shape to commit to exclusivity with Invisalign, which would block competing Clear Aligner manufacturers from receiving TRIOS scans, and thus from accessing the vast majority of dental professionals ordering Clear Aligners. To create this exclusivity, Pascaud asked 3Shape to enter into an anticompetitive joint venture into which 3Shape would contribute the TRIOS scanner. The proposed joint venture would allow Align to control the TRIOS scanner and use it to exclude rival Clear Aligner manufacturers from the market. The pretextual nature of the proposed joint venture was underscored by the fact that Align would maintain separate control of Invisalign.

89.     3Shape refused to grant Align exclusivity or to enter into the proposed pretextual joint venture.

90.     Throughout 2017, including at the International Dental Show in March 2017, Pascaud demanded that 3Shape agree to the joint venture.

91.     3Shape continued to refuse.

92.     Around the same time that Align made these demands, 3Shape heard from resellers and distributors that Align had threatened that it would end interoperability with TRIOS.

### *Align Terminated the Scanner Agreement to Further Its Efforts to Lock Dental Professionals into Anticompetitive Exclusive Supply Agreements*

93.     After 3Shape repeatedly refused to agree to Align's proposed joint venture, Align announced on December 20, 2017, that it would unilaterally terminate the Scanner Agreement

with 3Shape effective January 17, 2018.  As a result, the TRIOS scanner could no longer be used to submit digital scans for Invisalign in the United States.

94.     Although the Scanner Agreement extends beyond the United States, Align terminated the interoperability only with respect to the United States.  In the rest of the world, where Align has a materially lower Clear Aligner market share, Align continued to accept scans from the TRIOS scanner because Align profits from TRIOS' interoperability there just as it did when TRIOS' interoperability existed in the United States.

95.     Rumors that Align may terminate the ability to send TRIOS digital scans to Align in the rest of the world persist; and as a result, sales of TRIOS scanners have suffered.

96.     Many dental professionals and the American Association of Orthodontists voiced their displeasure with the termination due to the quality and open system aspects of the TRIOS scanner.  Despite this extensive customer criticism, Align carried through on its plan to terminate interoperability on January 31, 2018.

97.     For dental professionals seeking to order Invisalign Clear Aligners, termination of interoperability in the U.S. made the TRIOS "basically a paperweight," as one dental professional complained.

98.     By engaging in the conduct described above, Align erected the barriers it needed to maintain its dominant market position in the Clear Aligner Market in the face of its expiring patent portfolio.  Dental professionals seeking to send full mouth digital scans to Align now have only one viable option: Align's iTero scanner.

99.     That elimination of choice is not temporary and is not limited to 3Shape's TRIOS; at the Greater New York dental meeting in November 2017, Align's Pascaud communicated to 3Shape that Align will not validate *any* additional intraoral scanners for use with Invisalign.

19

100. For example, while Sirona has, since the start of this litigation, launched Primescan, a new scanner that has a digital workflow to create Sirona's SureSmile Clear Aligners, Align has not extended Invisalign interoperability to Primescan. Nor is Primescan qualified for Invisalign case submissions. Thus, Primescan cannot be used to send scans to Align.

101. In addition, on information and belief, while Align has in place interoperability agreements for ordering Invisalign cases with two other intraoral scanners—Midmark True Definition (formerly known as the 3M True Definition, referred to as MTD) and the Sirona CEREC Omnicam (referred to as CEREC)—neither of those agreements foster an open ecosystem for ordering Clear Aligners that could meaningfully erode Align's Clear Aligner dominance, nor were they intended to have that effect.

102. On information and belief, Align entered into, and has maintained, interoperability with MTD and CEREC in order to access the dental networks that use these intraoral scanners for restorative and other non-orthodontic applications (*e.g.*, crowns, bridges), rather than for Clear Aligner scans.

103. As explained below at Paragraphs 158 to 164, the MTD and the CEREC scanners are not viable substitutes for the iTero or TRIOS scanners because neither scanner is well suited to provide full mouth scans for Clear Aligner orders. Neither the MTD nor the CEREC scanners are viable options for dental professionals seeking to send digital scans for Clear Aligners.

104. Thus, with the TRIOS scanner sidelined, there is nothing to stop Align from maintaining and growing its dominant position in the Market For Clear Aligners and in the Market For Scanners For Orthodontic Treatment.

***By Terminating the Scanner Agreement, Align Acted Against Its Own Interests
and Sacrificed Short-Term Profits to Achieve its Anticompetitive End***

105.    Until Align terminated the Scanner Agreement, it profited from its business

relationship with 3Shape.

106.    Interoperability between TRIOS Scanners and Invisalign substantially increased

Invisalign orders to Align's economic benefit.  Between October 2016 and the end of January

2018, dental professionals sent over 40,000 orders for Invisalign through TRIOS in the United

States.  At a consumer price of $3,000 to $8,000 per Invisalign treatment, these cases

significantly contributed to Align's revenue.

107.    For example, in December 2017 and January 2018, Align received over 4,000

Invisalign cases per month submitted from TRIOS scanners in the United States. In this same

time period, Align received over 5,500 Invisalign cases per month submitted from the TRIOS.

3Shape's current Invisalign rate is 23,385 cases per month globally—none of which are from the

United States—which is nearly 40 percent of all Invisalign global submissions.

108.    Align also benefitted from interoperability because it gained access to 3Shape's

network of dental professionals, especially dentists, which one investment firm has referred to as

"the hardest nut for [Align] to crack."

109.    In addition, Align received valuable, competitive, and confidential information

about dental professionals' usage and preferences as a result of 3Shape's technology.  In

particular, 3Shape's technology kept track of certain confidential, competitively-sensitive data,

including the timing, number of and identity of the dental professionals using TRIOS scanners to

order Invisalign.  The information was made available to Align as a functional necessity of the

arrangement and protected from use by Align pursuant to the confidentiality provisions in the

Scanner Agreement.

110.    Interoperability also benefited dental professionals.  Because of the TRIOS open ecosystem, it gave them the ability to choose Align *among other* Clear Aligner options for their patients.

111.    As long as dental professionals could use the TRIOS scanner to order Invisalign Clear Aligners, they had a viable alternative to purchasing an iTero whether or not they desired to provide Invisalign to their patients.

112.    Interoperability thus enabled greater consumer choice in the Market For Clear Aligners.  That, in turn, fostered competition, which increases innovation and quality and lowers prices.

113.    By terminating the Scanner Agreement, Align sacrificed near-term profits (associated with a reduction of Invisalign orders from dental professionals using the TRIOS) and customer goodwill to maintain and enhance its monopoly power in the Market For Clear Aligners and gain monopoly power in the Market For Scanners For Orthodontic Treatment, excluding competitors from both markets.

114.    That was not a hypothetical threat to competition and consumer welfare; as described above, Align did, in fact, raise prices for Invisalign in July 2019.

### *Align Used 3Shape's Confidential Customer Information to Target Dental Professionals to Purchase iTero Scanners to Lock Them Into Align's De Facto Closed System*

115.    Once it had decided to terminate the Scanner Agreement, Align used 3Shape's TRIOS customer list—in blatant violation of the Scanner Agreement's confidentiality provisions—to target TRIOS customers.  By terminating interoperability, Align was able to pay short-term "compensation" to 3Shape's customers to coerce them to purchase iTero scanners, because TRIOS customers were no longer able to effectively order Invisalign through their

22

existing TRIOS scanners.  Because dental practices typically do not use more than one type of scanner and keep that scanner for a multi-year period (as explained above at Paragraphs 41 and 42), the customer's purchase of the iTero scanner meant that Align was able to cut off their access to other Clear Aligner manufacturers and lock them into a long term *de facto* exclusivity with Align.

116.    On December 18, 2017, Align wrote to 3Shape's customers purporting to update them regarding the "patent litigation" that Align brought against 3Shape, and claiming that 3Shape's customers would be directly affected because interoperability would be terminated on January 17, 2018.

117.    In that communication, Align told 3Shape customers that "termination of interoperability and discontinuance of accepting digital scans for Invisalign treatment and retention cases through TRIOS scanners will inconvenience you and your practice."

118.    Align then proceeded to outline for dental professionals two "choices."  First, 3Shape TRIOS "eligible" customers could purchase the iTero scanner at the one-time price of $14,999 (i.e., a discount of over 50 percent), which also included a one-year subscription and services (list price of $29,999), and an undisclosed discount on scans submitted for Invisalign Clear Aligner -submitted cases through April 30, 2018.

119.    Second, 3Shape TRIOS customers not purchasing an iTero Element and who had submitted at least one scan Invisalign Clear Aligners using the TRIOS scanner between January 1, 2017 and December 17, 2017 were "offered" undisclosed discounts on Invisalign orders submitted using Silicone Mold impressions in 2018.

120.    The 3Shape TRIOS customers targeted were already using TRIOS scanners to order Invisalign, so offering these dental professionals a "choice" of returning to the outdated,

inefficient and inaccurate method of using Silicone Molds was no choice at all.

121.    In addition, providing dental professionals with only 30 days' notice prior to terminating interoperability with 3Shape made it impossible for dental professionals to even investigate what other digital scanner options might be available.

122.    The combined effect of Align's decision to quickly terminate interoperability, payment of "compensation" through a one-time discount, and the lack of any other viable Orthodontic Scanner option, drove dental professionals to purchase an iTero scanner from Align.

123.    Because new Scanners For Orthodontic Treatment remain in a dental practice anywhere from three to five years (as Align knew), the targeting of existing 3Shape TRIOS users by Align effectively locked those dental professionals into the iTero-Invisalign *de facto* closed system for at least some period, and thus, was intended to and did protect Align's Clear Aligner market share and expand its share of the Market For Scanners For Orthodontic Treatment.

### Align's Patent Proceedings Against 3Shape Came on the Heels of 3Shape's Release of a Competitive Simulator Treatment

124.    During the course of its business relationship with 3Shape, Align learned that 3Shape was in the process of developing its Treatment Simulator software, which was set to launch at the end of 2017.

125.    Treatment Simulator software provides more alternatives to dental professionals by enabling them to work with Clear Aligner manufacturers other than Align.  Prior to the release of 3Shape's Treatment Simulator, such simulator software was available only to those purchasing iTero scanners.

126.    The day before 3Shape's scheduled release of the Treatment Simulator (and before Align announced that it would terminate the Scanner Agreement), Align filed a series of patent proceedings against 3Shape before this Court, the ITC, and the Patent Trial and Appeal

Board of the U.S Patent and Trademark Office, even though it had profitably been working with 3Shape on interoperability for the past several years.

127.    Align filed these suits to prevent, or at least delay, the launch of 3Shape's Treatment Simulator, which would have significantly reduced barriers to entry and assisted new entrants in the Market For Clear Aligners.  Align's efforts to slow down or completely halt the availability of 3Shape's Treatment Simulator software, including by potentially excluding TRIOS from the U.S. market, were designed to support Align's efforts to maintain its monopoly in the Market For Clear Aligners and acquire a monopoly in the Market For Scanners For Orthodontic Treatment.

128.    Align also used its patent, ITC, and PTAB proceedings as a pretext for its unilateral decision to terminate interoperability and forego profits in the Market For Clear Aligners in an effort to stifle competition.

### Align's Anticompetitive Conduct Allowed It to Raise Prices in the Face of Attempts by New Entrants to Compete

129.    Following the expiration of its key patents, Align began facing competition from a number of sophisticated new entrants in the Market For Clear Aligners.  Straumann, a global leader in tooth replacement and orthodontic solutions, purchased ClearCorrect Clear Aligners in August 2017, giving the ClearCorrect brand greater credibility and access to Straumann's vast network of dental professional customers.  Henry Schein, a worldwide distributor of medical and dental supplies, including 3Shape's TRIOS scanners, introduced SLX Clear Aligner in May 2018.  Likewise, in the same month, 3M introduced 3M Clarity Clear Aligners.  Shortly thereafter, Dentsply Sirona introduced SureSmile Clear Aligners in September 2018.

130.    None of these new Clear Aligners are exclusively linked to a Scanner For Orthodontic Treatment in an arrangement akin to the iTero-Invisalign *de facto* closed system.

131. The entry of new competitors in the Market For Clear Aligners should have resulted in reduced—not increased—prices.

132. But, as a result of the conduct described above, Align was able to block new competitors from gaining meaningful share in the Market For Clear Aligners, including through its foreclosure of TRIOS, the only viable scanner with an open platform sufficient to compete with iTero and allow competition with Invisalign.

133. Align knows that its anticompetitive conduct has insulated it from competition from new entrants. That is why in the middle of this year, in the wake of increased competition from several new entrants, Align *raised* the price of Invisalign. Indeed, in discussing the Invisalign price increase, Hogan admitted that Align can "still jack price in the marketplace."

### *Align's Anticompetitive Conduct Has Injured 3Shape's Business*

134. Align has the specific intent to maintain its monopoly in the Clear Aligner Market and to monopolize the Market For Scanners For Orthodontic Treatment.

135. As a result of Align's anticompetitive conduct, 3Shape has been injured in the Market For Scanners For Orthodontic Treatment. 3Shape has experienced order cancellations and returns of the TRIOS scanners as a direct result of Align's anticompetitive conduct. For example, over 100 TRIOS scanners were returned due to Align's termination of the Scanner Agreement. 3Shape has been forced to compensate its resellers/distributors for their financial losses stemming from TRIOS order cancellations and returns caused by Align's anticompetitive conduct.

136. In addition, 3Shape's TRIOS sales and market share in the Scanners For Orthodontic Treatment market has fallen precipitously as dental professionals have ceased purchasing the TRIOS scanner as they have been forced to turn instead to the iTero scanner. For

example, as described above, 3Shape lost the opportunity to secure a deal to supply scanners to Aspen Dental, the nation's largest branded DSO with nearly 700 locations, due to Align's anticompetitive conduct.

137.     Despite offering significant discounts to orthodontists and other dental professionals to incentivize the purchase of a TRIOS scanner, 3Shape is unable to compete in the face of the anticompetitive barriers imposed by Align's exclusionary conduct, including Align's *de facto* exclusive agreements with dental professionals.  Further, because 3Shape does not sell Clear Aligners, it cannot make a comparable offer to Align's bundled discounts for iTero and Invisalign.

138.     3Shape's injury is inextricably intertwined with Align's anticompetitive conduct and harm to competition in the Clear Aligner Market.  Injury to 3Shape was, and remains, essential to Align's ability to maintain and enhance its dominance in the Clear Aligner Market.

139.     Because 3Shape's TRIOS is an open system that allows Align's Clear Aligner rivals to access dental professionals, Align needed to shut 3Shape out of the Market For Scanners For Orthodontic Treatment to cut off its rivals' access to dental professionals ordering Clear Aligners and keep them out of the Clear Aligner Market.  Injuring 3Shape was the very means by which Align could foreclose its Clear Aligner competitors, and 3Shape's injury was necessary for Align's plan to succeed.

140.     Align's conduct has harmed competition in both markets by, among other things, excluding rivals, increasing barriers to entry, and imposing costs on rivals.  This conduct has resulted in less consumer choice and higher consumer cost.

## THE RELEVANT PRODUCT MARKETS

### *The Clear Aligner Market*

141.    There is a relevant market for the manufacture and sale of Clear Aligners in the United States—the Market For Clear Aligners.

142.    Align is dominant in the Clear Aligner Market, with an over 90 percent share in that market.

143.    Customers do not see Clear Aligners as reasonably interchangeable with traditional metal braces.  Clear Aligners are removable, and are therefore suitable for patients engaged in activities where traditional metal braces may pose material risk for dental injury—*e.g.*, contact sports.  As Align has alleged in a recent court filing, Clear Aligners have no metal brackets or wires to cause irritation for patients, and are more comfortable to wear than metal braces.  Further, because Clear Aligners move teeth more gradually than traditional braces, they also cause less discomfort.

144.    Clear Aligners also require much less time for treatment than traditional metal braces.  As Align explains in its annual report, "[t]he average treatment [using traditional metal braces] takes approximately 12 to 24 months to complete" while Clear Aligners can reduce total treatment time by up to 50 percent.  Align further notes that traditional braces "require[] several hours of direct dental professional involvement, known in the industry as 'chair time,'" while Clear Aligners require significantly less "chair time" because the treatment course is planned out in advance and the patient can switch the individual aligners outside the professional's office.

145.    Braces are the exclusive purview of orthodontists and cannot be prescribed by dentists.  In contrast, dentists can and do prescribe Clear Aligners.

146.    Braces also cannot be offered in a storefront with only a scanner and a salesperson like Clear Aligners.

147.    While cross-elasticity of demand exists between Invisalign and other Clear Aligners, cross-elasticity of demand is not present between Clear Aligners and metal braces. Pricing of metal braces does not constrain the pricing of Clear Aligners.  Further, consumers do not choose to purchase Clear Aligners over metal braces (or vice versa) based upon price.

148.    Market and industry publications recognize that there is a distinct Market For Clear Aligners that does not encompass all products that can be used for straightening teeth, such as metal braces.

149.    The Market For Clear Aligners is the United States.  Align has marketed and/or sold Invisalign to dental professionals in all fifty states.

### *The Market For Scanners For Orthodontic Treatment*

150.    There is a relevant market for the manufacture and sale of digital intraoral scanners used by dental professionals to generate full mouth scans for orthodontic treatment, including to order Clear Aligners in the United States—the Market For Scanners For Orthodontic Treatment.

151.    Specifically, dental professionals use these scanners for orthodontic treatment to scan a patient's full mouth to obtain a three-dimensional digital impression of the patient's dental structure (a "scan"), process and evaluate it through task-specific software, and then submit the scans to Clear Aligner manufacturers that are customized to treat the patient's needs.  Having the ability to access and receive scans is indispensable to competing in the Clear Aligner Market.

152.    iTero and TRIOS are the only two viable scanners in the Market For Scanners For Orthodontic Treatment.

153.    iTero and TRIOS are the only two viable scanners for orthodontic treatment that easily and accurately scan a patient's upper and lower jaws, teeth, and bite to create and deliver a

digital 3D impression for ordering Clear Aligners.  They are also the only scanners that have the software and delivery systems to accommodate digital Clear Aligner workflow.  And, they have been in the same price class.

154.    For all of the reasons described above, TRIOS is the preferred intraoral scanner for dental professionals seeking to order Clear Aligners.  iTero is slower, more difficult to use, larger, lacks CAD integration, and is a closed system. One commentator, reviewing the latest intraoral scanners, explained that "[t]he iTero does, however, have one saving grace, and that is its association with Invisalign."

155.    Align's iTero had approximately 60 percent share of the Scanners For Orthodontic Treatment purchased in 2017.

156.    Following Align's termination of interoperability with 3Shape's TRIOS, iTero's market share has increased significantly in the United States.  In the third quarter of 2019, Align's iTero scanner and services revenues increased 16.5 percent, year-over-year.

157.    3Shape's growth in the Market For Scanners For Orthodontic Treatment effectively stopped in 2018.

158.    The MTD and CEREC scanners are not viable substitutes for the iTero or TRIOS scanners, and they are not in the Market For Scanners For Orthodontic Treatment.  The MTD and the Sirona scanners are not viable substitutes for the iTero or TRIOS scanners because they are not well suited to provide full mouth scans for Clear Aligner orders. The MTD and CEREC scanners are not a viable option for dental professionals seeking to send digital scans for Clear Aligners.

159.    Unlike the iTero and TRIOS scanners, which were designed and manufactured to be Scanners For Orthodontic Treatment, both the MTD and CEREC scanners are focused on

scanning individual teeth for crowns and similar local dental restorative work and not on comprehensive, full-mouth orthodontic treatments. It takes significantly longer to scan a patient's entire mouth with a MTD or CEREC scanner than with TRIOS or iTero.

160. The MTD and CEREC scanners are also technologically inferior to the iTero and TRIOS scanners. Pascaud has testified in the 1091 ITC proceeding that TRIOS is better than the MTD and CEREC scanners, and that MTD and CEREC scanners "are outdated."

161. The MTD and CEREC scanners are not purchased by dental professionals as Scanners For Orthodontic Treatment, including for ordering Clear Aligners. The actual utilization rates for MTD's and CEREC's scanners to order Clear Aligners are low.

162. The MTD and CEREC scanners rely on outdated technology, and their utilization rates have been declining. The MTD scanner requires the use of a powder for scanning and generates a black-and-white scan. The CEREC scanner's hardware is antiquated, having not been updated since 2012.

163. Invisalign's advertising does not include MTD and CEREC as scanner options that can be used to order Invisalign—rather, the only scanner disclosed in its advertising is iTero.

164. The process for sending the digital scans to Align from the MTD or CEREC scanners is also more cumbersome and time consuming than sending digital scans from the iTero scanner and requires an additional, manual quality approval step based on the poor quality of the scan from such scanners.

165. The other fringe scanners also do not competitively constrain Align. As described above, Align has stated that it will not agree to interoperability with additional manufacturers of Scanners For Orthodontic Treatment, so the barriers to entry for a new supplier and scanner are insurmountable. For example, Primescan is not (and cannot be) a viable competitor because—in

light of Align's exclusionary conduct—it has no chance of gaining traction as a new entrant.

166.    Silicone Molds are not part of the Market For Scanners For Orthodontic Treatment because they are not viable substitutes for iTero and TRIOS scanners.

167.    Before the advent of digital intraoral scanners, dental professionals seeking to prescribe Clear Aligners were required to make manual dental impressions by inserting a metal or plastic tray containing impression material, such as silicone-based polyvinyl-siloxane or alginate, into a patient's mouth to general a cast of the patient's teeth ("Silicone Mold").

168.    To take a dental impression using Silicone Molds, patients must bite into a rubbery and runny casting material for several minutes, waiting for it to set.  During this process, patients are subject to unpleasant odor and taste, and may experience gagging.  Patients may have to repeat this process more than once to get an adequate dental impression for Clear Aligners as manual impressions are often not accurate due to distortions and incomplete details.

169.    As such, Silicone Molds are less appropriate for use with Clear Aligners, which require extremely accurate full mouth scans, including to allow for real-time simulations of teeth movement to best plan a course of treatment.  In particular, full mouth digital scans also offer flexibility and customization, because they allow dental professionals to use digital scans to simulate teeth movement and outcomes in software.

170.    Dental professionals, and Align itself, do not view Silicone Molds as substitutes for full mouth scans.  As Align reported in its Q1 2019 Financial Statement, Align expects that within a "year or two, nearly all Invisalign cases will be submitted digitally, primarily through *an iTero* scanner."  In its July 24, 2019 earnings call, Align's CEO confirmed that "dental is going digital."

171.    Although Align technically accepts Silicone Molds for Invisalign orders, Align

32

has itself admitted that these impressions are less accurate, more costly, and more stressful for the patient.  In fact, Align has highlighted for those considering a Silicone Mold that the rejection rate for molds is 13 to 14 times higher than the rejection rate for an iTero digital scan.

172.    Indeed, in its 2017 Annual Report, Align stated

> digital scanning is more efficient and precise and more comfortable for patients, compared to the mess, discomfort and subjective nature of taking physical impressions.  The digitally scanned model is more accurate than a physical impression and substantially reduces the rate of restoration 'remakes' so patients are recalled less often and the appointment time for the restoration is shorter because of fewer adjustments which results in greater overall patient satisfaction.

173.    The Market For Scanners For Orthodontic Treatment in the United States is a national market.  Align has marketed and/or sold its iTero scanners to dental professionals in all fifty states.

## COUNT ONE
## MONOPOLIZATION OF THE CLEAR ALIGNER MARKET (15 U.S.C. § 2)

174.    3Shape repeats and reasserts each of the allegations contained in Paragraphs 1-173 as if fully set forth herein.

175.    Align possesses monopoly power in the Clear Aligner Market, including the power to control prices and exclude competition.

176.    As more fully alleged above, Align has willfully and intentionally engaged in conduct that has had the anticompetitive effects of allowing Align to unlawfully maintain and enhance its monopoly in the Clear Aligner Market and preventing its rivals from competing for Clear Aligner sales.

177.    Align's anticompetitive conduct has effectively restrained and harmed competition in the Clear Aligner Market.

178.    There is no legitimate business justification for Align's conduct.

179.     As a direct, foreseeable, and proximate result of Align's anticompetitive conduct, 3Shape has been injured in its business, including by losing existing and potential 3Shape TRIOS customers and sales.

180.     3Shape is entitled to damages and an injunction that terminates the ongoing violations alleged in this Amended Complaint.

**COUNT TWO**
**ATTEMPTED MONOPOLIZATION OF THE MARKET FOR SCANNERS FOR ORTHODONTIC TREATMENT (15 U.S.C. § 2)**

181.     3Shape repeats and reasserts each of the allegations contained in Paragraphs 1-173 as if fully set forth herein.

182.     Align has monopoly power in the Clear Aligner Market, including the power to control prices and exclude competition.

183.     Align has willfully, knowingly, and with specific intent to do so, attempted to acquire monopoly power in the Market For Scanners For Orthodontic Treatment.  Align has engaged in conduct with anticompetitive effects directed at accomplishing the unlawful objectives of controlling prices and preventing competition in the Market For Scanners For Orthodontic Treatment.

184.     As a result of Align's conduct, including its exclusive agreements with dental professionals and its decision not to interoperate with any other Scanners For Orthodontic Treatment, the barriers to entry into the Market For Scanners For Orthodontic Treatment are insurmountable.

185.     There is a dangerous probability that Align will succeed in its attempt to monopolize the Market For Scanners For Orthodontic Treatment.

186.     There is no legitimate business justification for Align's conduct.

187.     As a direct, foreseeable, and proximate result of Align's anticompetitive conduct,

3Shape has been injured in its business, including by losing existing and potential TRIOS scanner customers and sales.

188.    3Shape is entitled to damages and an injunction that terminates the ongoing violations alleged in this Amended Complaint.

## PRAYER FOR RELIEF

WHEREFORE, 3Shape demands a trial by jury and hereby respectfully requests:

(a)    Pursuant to 15 U.S.C. § 15, compensatory and trebled damages resulting from Align's violations of the Sherman Act;

(b)    Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Align from continuing the unlawful acts in violation of the Sherman Act;

(c)    Pre-judgment and post-judgment interest at the maximum legal rate;

(d)    3Shape's costs, expenses, and reasonable attorneys' fees in bringing this action; and

(e)    Such other relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), 3Shape demands a trial by jury of all issues properly triable to a jury in this case.

_/s/ Geoffrey G. Grivner_
Geoffrey G. Grivner (#4711)
BUCHANAN INGERSOLL & ROONEY PC
919 North Market Street, Suite 990
Wilmington, DE 19801
Tel: (302) 552-4207
geoffrey.grivner@bipc.com

Wendelynne J. Newton (admitted *pro hac vice*)
Gretchen L. Jankowski (admitted *pro hac vice*)
BUCHANAN INGERSOLL & ROONEY PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219-4413
Tel: (412) 562-8800
wendelynne.newton@bipc.com
gretchen.jankowski@bipc.com

S. Lloyd Smith (admitted *pro hac vice*)
BUCHANAN INGERSOLL & ROONEY PC
1737 King Street, Suite 500
Alexandria, VA 22314-2727
Tel: (703) 838-6514
lloyd.smith@bipc.com

Carrie G. Amezcua (admitted *pro hac vice*)
BUCHANAN INGERSOLL & ROONEY PC
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555
Tel: (215) 665-3859
carrie.amezcua@bipc.com

Derek Ludwin (admitted *pro hac vice*)
Ross Demain (admitted *pro hac vice*)
Sonia Lahr-Pastor (admitted *pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
Tel: (202) 662-6000
dludwin@cov.com
rdemain@cov.com
slahrpastor@cov.com

*Attorneys for Plaintiff*
3SHAPE TRIOS A/S

36