## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| 3SHAPE TRIOS A/S, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1332-LPS |
| | ) | |
| ALIGN TECHNOLOGY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

      This is an antitrust case.  Plaintiff 3Shape TRIOS A/S ("3Shape" or "Plaintiff") filed suit against Defendant Align Technology, Inc. ("Defendant" or "Align") on August 28, 2018, alleging monopolization and attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  (D.I. 1.)  The Court dismissed 3Shape's original complaint without prejudice on September 26, 2019.  (D.I. 59, 62.)  No. 18-1332-LPS, 2019 WL 4686614 (D. Del. Sept. 26, 2019) (adopting Report and Recommendation, 2019 WL 3824209 (D. Del. Aug. 15, 2019)).  3Shape filed an amended complaint on October 28, 2019.  (D.I. 63.)  Pending before the Court is Align's motion to dismiss 3Shape's amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (D.I. 66.)  Because 3Shape has plausibly alleged both anticompetitive conduct and relevant markets, I recommend that Align's motion be DENIED.

## I.  BACKGROUND[1]

      Defendant Align is a Delaware corporation that sells Invisalign, a system of clear plastic aligners for straightening teeth.  (D.I. 63 ¶¶ 1, 25-26.)  Aligners are ordered through dental

---

[1] I assume the facts alleged in the amended complaint to be true for purposes of resolving this motion.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

professionals, who prescribe them to patients with teeth misalignment.  (*Id.* ¶¶ 8, 28.)  Aligners are custom-made, which requires an accurate representation of the patient's upper and lower jaws, teeth, and bite.  (*Id.*)  A fast and accurate way to obtain an accurate image of the patient's full mouth is to scan it with a digital intraoral scanner.  (*Id.*)  With a scanner, a dental professional can scan a patient's full mouth, process and evaluate the scan through task-specific software, and submit the scan to aligner manufacturers.  (*Id.* ¶ 151.)  According to the amended complaint, digital scanners "are essential to dental professionals offering Clear Aligners to their patients and are essential to effective sales of Clear Aligners by dental professionals."  (*Id.* ¶ 40.)  Typically, a dental practice can only afford to own one scanner because it is a significant capital investment— not only are the scanners themselves expensive, but the accompanying software subscription can be several thousand dollars annually.  (*Id.* ¶ 41.)

In addition to selling aligners, Align sells the iTero Element digital intraoral scanner, which it introduced in 2015.  (*Id.* ¶¶ 3, 39.)  The iTero Element was designed to send digital scans directly to Align for orders of Invisalign.  (*Id.*)  It cannot send scans to Align's competitors.  (*Id.* ¶¶ 44-45.)

Plaintiff 3Shape is a Danish corporation that designs and manufactures dental equipment and software, including digital intraoral scanners.  (*Id.* ¶¶ 24, 73.)  3Shape sells the TRIOS digital intraoral scanner, which "can be used for scanning, designing and ordering of clear aligners and a number of other orthodontic treatments or dental products."  (*Id.* ¶ 73.)

In December 2015, Align and 3Shape entered into an interoperability agreement "under which the parties worked together to build an interface so that dental professionals could send TRIOS scans into Align's Invisalign work flow."  (*Id.* ¶ 80.)  Pursuant to the agreement, "3Shape was certified by Align to send digital scans from 3Shape's TRIOS to Align for Invisalign orders."

(*Id.* ¶ 16.)  The interoperability agreement permitted 3Shape to continue to provide scans to other aligner manufacturers.  (*Id.* ¶ 85.)  In December 2017, Align announced that it was unilaterally terminating the agreement with 3Shape with respect to Invisalign orders placed from the United States.  (*Id.* ¶ 93.)  Since the termination, which became effective in January 2018, Invisalign can no longer be ordered with scans sent directly from a TRIOS in the United States.  (*Id.* ¶¶ 93-94.)  In the rest of the world, where Align has a lower share in the aligner market, Align continues to accept scans sent from TRIOS scanners.  (*Id.* ¶ 94.)

The amended complaint defines two markets relevant to 3Shape's antitrust claims.  First, it alleges the existence of a relevant market in the United States for the manufacture and sale of "custom-manufactured removable dental aligners made of clear plastic that correct teeth misalignment."  (*Id.* ¶¶ 1, 141-148.)  According to the amended complaint, consumers do not view braces as reasonably interchangeable with aligners and the price of braces does not affect the price of aligners.  (*Id.* ¶¶ 143, 147.)  Aligners are removable, making them appropriate for sports, and they are more comfortable and require less time for treatment than braces.  (*Id.* ¶¶ 143-144.)  Unlike braces, which can only be prescribed by orthodontists, aligners can be prescribed by dentists.  (*Id.* ¶ 145.)  In addition, treatment with aligners requires fewer in-person office visits than with braces.  (*Id.* ¶ 144.)

The amended complaint also alleges the existence of a relevant market in the United States for the manufacture and sale of "digital intraoral scanners used by dental professionals to generate full mouth scans for orthodontic treatment, including to order Clear Aligners."  (*Id.* ¶ 150.)  The amended complaint alleges that only two scanners on the market are "viable" for ordering aligners: Align's iTero and 3Shape's TRIOS.  (*Id.* ¶¶ 8, 152.)  It alleges that scanners designed to scan individual teeth for crowns and local dental restorative work are not adequate substitutes because

they are slower and less accurate.  (*Id.* ¶¶ 158-165.)  It further alleges that silicone molds are not adequate substitutes for generating dental representations because they are less accurate, more cumbersome, inconvenient, and unpleasant for the patient.  (*Id.* ¶¶ 166-170.)

Align has significant shares in both the aligner and scanner markets.  Align manufactures over 90 percent of the clear aligners sold in the United States and it has monopoly power in that market.  (*Id.* ¶¶ 2, 26-27, 142, 182.)  In 2017, Align's iTero scanner had approximately a 60 percent share in the scanner market (as defined above).  (*Id.* ¶¶ 1, 155.)  Following Align's termination of its agreement with 3Shape in 2017, the iTero's share of the scanner market has increased significantly.  (*Id.* ¶¶ 155-156.)

Align has entered into several types of contracts with dental professionals and dental service organizations ("DSOs") that, 3Shape contends, operate to maintain and enhance Align's monopoly power in the aligner market and give rise to a dangerous probability that Align will acquire monopoly power in the scanner market.  (*Id.* ¶¶ 11-12.)  The first type includes Align's multi-year contracts with DSOs, including Heartland Dental and Aspen Dental.  On July 25, 2018, Align announced a deal with Heartland Dental, the nation's largest DSO, to place iTero scanners in 90% of supported member dental offices by the end of 2018.  (*Id.* ¶ 51.)  That deal resulted in Heartland Dental's purchase of over 900 scanners.  (*Id.*)  That same day, Align announced a deal with Aspen Dental, the nation's largest branded DSO, to place iTero scanners in all of its locations.  (*Id.* ¶ 53.)  3Shape submitted a bid for the Aspen Dental contract but was not selected because TRIOS scanners were not interoperable with Align's Invisalign system.  (*Id.* ¶ 54.)

The second type of contract involves Align's Fusion Program.  Launched in 2017, the program provides a significant discount on the iTero scanner to dental professionals who commit to ordering a certain number of Invisalign cases each year for three years.  (*Id.* ¶¶ 56-57.)  A dental

4

professional who fails to meet the minimum cases is subject to penalties that "could total $10,000 over three years, or 30 percent or more of the cost of the iTero scanner." (*Id.* ¶¶ 58, 60.) According to the amended complaint, Align set the required number of cases in excess of the average dental professional's anticipated total number of aligner cases, "which forced the dental professionals to either stop sending cases to Align's competitors, or trigger penalties." (*Id.* ¶¶ 58-59.) Align offered the Fusion program to "major DSOs," and it resulted in a dramatic increase in sales of iTero scanners to DSOs and an increase in sales of Invisalign. (*Id.* ¶ 50.)

3Shape alleges that it could not compete with Align's Fusion Program offering. (*Id.* ¶ 64.) Although 3Shape's TRIOS and Align's iTero were sold at similar list prices, the Fusion program effectively made the iTero $10,000 cheaper. (*Id.*) While 3Shape could drop its pricing to compete with the lower price, it would cause 3Shape to forego nearly a third of its revenue. (*Id.*) According to 3Shape, the Fusion Program has foreclosed portions of both the aligner and scanner markets from competitors. (*Id.* ¶¶ 62-64.)

As a result of Align's arrangements with DSOs, DSO members are effectively locked into using iTero scanners and ordering Invisalign. (*Id.* ¶ 47.) 3Shape alleges that Align's sales of iTero scanners to DSOs have "increased dramatically" as a result of the DSO arrangements, and that they "have enabled Align to rapidly increase its market share" in the scanner market. (*Id.* ¶¶ 50, 55.) 3Shape further alleges that the DSO contracts have enabled Align to "maintain its monopoly" in the aligner market. (*Id.* ¶ 55.)

The third type of arrangement involves Align's Advantage Program. Under that program, dental professionals received discounts on Invisalign based on the total number of cases they submit. (*Id.* ¶¶ 65-66.) Dental professionals that submit the most cases receive the largest discounts. (*Id.*) Until recently, once a dental professional reached the highest discount level they

would retain the same discount level moving forward.  (*Id.* ¶ 67.)  Align changed the program in 2018 so that dental professionals were offered discounts based solely on their sales for in the previous six months.  (*Id.* ¶ 68.)  Consequently, to achieve the highest discounts, dental professionals must consistently order from Align.  (*Id.* ¶ 69.)  These discounts, which can affect a dental professional's margins by 30 percent or more, are necessary for a dental professional to effectively compete with dental professionals who receive the discounts.  (*Id.*)  According to the amended complaint, "[t]he only way for dental professionals to achieve the highest discount levels is to purchase and use an iTero scanner."  (*Id.* ¶ 70.)

3Shape alleges that "Align's conduct has harmed competition in both [the scanner and aligner] markets by, among other things, excluding rivals, increasing barriers to entry, and imposing costs on rivals."  (*Id.* ¶ 140.)  According to the amended complaint, "[t]his conduct has resulted in less consumer choice and higher consumer cost."  (*Id.*)  The amended complaint contains two counts: monopolization of the clear aligner market under Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count 1); and attempted monopolization of the scanner market under Section 2 of the Sherman Act (Count 2).  (*Id.* ¶¶ 174, 181.)

Align filed the pending motion to dismiss the amended complaint on November 12, 2019 (D.I. 66), and the parties completed the briefing on December 20, 2019.  (D.I. 72.)  Both parties requested oral argument (D.I. 73, 74), and I heard oral argument on February 13, 2020.  ("Tr. __".)

## II.  LEGAL STANDARDS

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A possibility of relief is not enough. *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  In determining the sufficiency of the complaint under the plausibility standard, all "well-pleaded facts" are assumed to be true, but legal conclusions are not. *Id.* at 679.

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (internal marks omitted). "Antitrust claims in particular must be reviewed carefully at the pleading stage because false condemnation of competitive conduct threatens to 'chill the very conduct the antitrust laws are designed to protect.'" *In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 218 (S.D.N.Y. 2019) (quoting *Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004)).  However, the same *Twombly* plausibility standard applies.  *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) ("[I]t is inappropriate to apply Twombly's plausibility standard with extra bite in antitrust and other complex cases.").

## III. DISCUSSION

Section 2 of the Sherman Act, 15 U.S.C. § 2, makes it unlawful to "monopolize" or "attempt to monopolize."[2]  It does not prohibit monopolies.  Indeed, the possession of monopoly power is not only legal, "it is an important element of the free-market system."  *Trinko*, 540 U.S. at 407 ("The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth.").

A Section 2 plaintiff must therefore do more than just prove a monopoly.  To succeed on a monopolization claim, the plaintiff must demonstrate both (1) the defendant's possession of monopoly power in a relevant market and (2) anticompetitive conduct.  *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).  To establish attempted monopolization, the plaintiff must show (1) anticompetitive conduct, (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power in a relevant market.  *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir. 2018).   Both types of claims require "anticompetitive conduct."  *See id.* at 338 ("Anticompetitive conduct is the hallmark of an antitrust claim.").

A private plaintiff (as opposed to a government plaintiff) must also demonstrate that it has antitrust standing, that is, that the plaintiff suffered injuries caused by the defendant's

---

[2] "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."  15 U.S.C. § 2.

anticompetitive conduct.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012).

Align argues that the amended complaint fails to plausibly allege anticompetitive conduct, monopoly power, and antitrust standing.  I disagree.

### A.  Anticompetitive Conduct

Anticompetitive conduct is "generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits."  *Broadcom*, 501 F.3d at 308. On the other hand, "[c]onduct that merely harms competitors, . . . while not harming the competitive process itself, is not anticompetitive."  *Id.*; *W. Penn*, 627 F.3d at 108 ("The line between anticompetitive conduct and vigorous competition is sometimes blurry, but distinguishing between the two is critical, because the Sherman Act 'directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.'").  Accordingly, in order to be deemed exclusionary, a monopolist's conduct must have an anticompetitive effect on the market.  *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001).

"'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties."  *LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C. Cir.1998)).  Over the last century, however, courts have recognized various types of conduct that have the potential to harm competition.  Examples of agreements that may constitute anticompetitive conduct under Section 2 include exclusive dealing arrangements, *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005), and tying agreements, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992).

Courts also recognize that deceptive or bad faith conduct can be anticompetitive.  *See Broadcom*, 501 F.3d at 314 (patentee's deception of a standards setting organization can be anticompetitive); *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) ("*PRE*") (sham litigation can be anticompetitive).

Certain types of pricing behavior can also constitute anticompetitive conduct.  For example, setting prices below one's costs can constitute anticompetitive predatory pricing (if other requirements are met).  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-23 (1993).  The Third Circuit (but not the Supreme Court) has also held that offering bundled discounts can constitute anticompetitive conduct.  *LePage's*, 324 F.3d at 154-58.

As explained in more detail below, there are legal rules that govern the application of each of these theories of anticompetitive conduct.  Still, challenged conduct "may be susceptible to more than one court-defined category."  *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020).  "At bottom, the purpose of identifying these categories of conduct is to help determine 'the presence or absence of harmful effects, which are both the reason for any antitrust concern and often the simplest element to disprove.'"  *Id.* (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*: *An Analysis of Antitrust Principles and Their Application* ¶ 1701d, at 33 (4th ed. 2015)).

Here, 3Shape alleges that Align has engaged in two types of monopolistic conduct recognized by the antitrust laws: (1) exclusive dealing; and (2) bundled discount arrangements.[3] The parties do not dispute that exclusive dealing arrangements and bundled discounts are

---

[3] In this round of briefing, 3Shape does not contend that Align's other actions—its design of the iTero Element Scanner, its termination of the interoperability agreement with 3Shape in 2017, and its patent litigation—are independently anticompetitive.  (D.I. 71 at 13-16; *see also* Tr. 22:4-7.)  Rather, 3Shape argues that Align's other conduct has contributed to the overall exclusionary effect and evidences its intent to monopolize.  (*Id.*)

cognizable theories of anticompetitive conduct.  They dispute, however, whether 3Shape alleged

enough facts to move forward on either theory.  I conclude that it has.

### 1.  Exclusive Dealing

3Shape contends that Align's agreements with DSOs and dental professionals constitute

unlawful exclusive dealing arrangements.  In an exclusive dealing arrangement, "a buyer agrees

to purchase certain goods or services only from a particular seller for a certain period of time."  *ZF*

*Meritor*, 696 F.3d at 270.  While an exclusive dealing claim requires a showing of an agreement

between the buyer and seller, an express exclusivity provision is not necessary.  *Id.* at 282.  "*De*

*facto* exclusive dealing claims are cognizable under the antitrust laws" where the effect of the

agreement "in the real world" demonstrates that competitors are excluded from a substantial share

of the relevant market.  *ZF Meritor*, 696 F.3d at 270-272, 282-83.

Exclusive dealing arrangements are not *per se* illegal.  Rather, due to their potentially

procompetitive benefits, the legality of an exclusive arrangement is judged under the rule of reason.

*Id.* at 271.  Whether an arrangement is legal "depends on whether it will foreclose competition in

such a substantial share of the relevant market so as to adversely affect competition."  *ZF Meritor,*

696 F.3d at 271.  There is no set formula for conducting the analysis, "but modern antitrust law

generally requires a showing of significant market power by the defendant, . . . substantial

foreclosure, . . . contracts of sufficient duration to prevent meaningful competition by rivals, . . .

and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive

effects."  *ZF Meritor*, 696 F.3d at 271-72.

I agree with 3Shape that its amended complaint plausibly alleges unlawful exclusive

dealing in both markets.  3Shape alleges that Align has significant shares in both markets: 90

percent in the aligner market and 60 percent in the scanner market.  (D.I. 63 ¶¶ 2, 26-27, 142, 155

182.)  It further alleges that, as a result of the DSO arrangements, Align's sales of its iTero scanners to DSOs "increased dramatically" and that they "have enabled Align to rapidly increase its market share" in the scanner market.  (*Id.* ¶¶ 50, 55.)  And 3Shape alleges that the DSO arrangements have enabled Align to "maintain its monopoly" in the aligner market.  (*Id.* ¶ 55.)  3Shape alleges that the DSO agreements with Heartland Dental and Aspen Dental are multi-year, *de facto* exclusive dealing contracts that essentially require members of the two largest DSOs in the United States to purchase their scanners from Align.  (*Id.* ¶¶ 47-55.)  It alleges that the result of the agreements is to lock DSO members into using iTero scanners and ordering Invisalign.  (*Id.*)  It further alleges that, in connection with its Fusion program, Align offered discounts on its iTero scanners to other DSOs in exchange for multi-year Invisalign order commitments that could only be met if participating dental professionals sent scans exclusively to Align for Invisalign, and not its competitors.  (*Id.* ¶¶ 56-64.)  3Shape alleges that its own sales and market share have "fallen precipitously" as a result of Align's conduct.  (Id. ¶ 136.)  And it alleges that Align's conduct has likely and actual anticompetitive effects, including higher costs for consumers.  (*Id.* ¶¶ 140, 177, 183.)

Align argues that the amended complaint fails to adequately allege "substantial foreclosure" of the relevant markets.  (D.I. 67 at 9.)  In particular, Align points out that the amended complaint lacks detail about the percentage of the market foreclosed to competitors.  (*Id.*; Tr. 7:15– 10:2)  But the cases cited by Align do not stand for the proposition that such detail is required at the pleading stage.  *See, e.g., Eisai Inc. v. Sanofi Aventis US, LLC*, 821 F.3d 394 (3d Cir. 2016) (summary judgment); *ZF Meritor*, 696 F.3d 254 (trial); *Dentsply Int'l*, 399 F.3d 181 (trial); *Barr Labs. v. Abbott Labs.*, 978 F.2d 98 (3d Cir. 1992) (summary judgment); *Roxul USA, Inc. v. Armstrong World, Indus., Inc.*, No. 17-1258, 2019 WL 1109868 (D. Del. Mar. 8, 2019) (summary

judgment); *Insight Equity A.P. X, LP v. Transitions Optical, Inc.*, No. 10-635, 2016 WL 3610155 (D. Del. July 1, 2016) (summary judgment).[4]  Viewing the amended complaint in its entirety and in the light most favorable to 3Shape, there is enough detail to make it plausible that the effect of the alleged exclusive dealing arrangements was to substantially foreclose competitors from the relevant markets.  Whether the foreclosure was *in fact* "substantial" is a conclusion that does not need to be reached, and would be inappropriate to reach, at this stage of the litigation.  That determination will ultimately require factual assessments and expert analyses that are inappropriate at the pleading stage.

I conclude that the amended complaint plausibly alleges unlawful exclusive dealing.

### 2. Bundled Discounts

3Shape also argues that Align's Fusion program—which provided significant discounts on Align's iTero scanner to dental professionals who committed to ordering a high number of Invisalign cases each year for three years—constitutes an unlawful bundled discount arrangement. I agree with 3Shape that the amended complaint plausibly alleges an anticompetitive bundled discount.

Price discounts are generally not anticompetitive.  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 451 (2009); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986); *Philadelphia Taxi Ass'n*, 886 F.3d at 340 ("It is well established that lower prices, as

---

[4] The only case cited by Align that dismissed an exclusive dealing claim at the pleading stage for failure to allege substantial foreclosure is *International Construction Products LLC v. Caterpillar Inc.*, C.A. No. 15-108, 2016 WL 264909, at *4 (D. Del. Jan. 21, 2016).  In that case, the court noted that "the factual allegations [in the complaint] pertaining to exclusive dealing [were] sparse" and that it "allege[d] no facts about the nature of the exclusive dealing arrangements and their potentially anticompetitive effects."  *Id.* at *5-6.  That case does not stand for the proposition that a specific percentage of foreclosure must be alleged.

Here, 3Shape has alleged numerous facts about the nature of Align's arrangements with DSOs and has alleged facts regarding their exclusionary effects.

long as they are not predatory, benefit consumers—'regardless of how those prices are set.'" (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990)).  But there are exceptions to the general rule.  One exception is predatory pricing, which is when a monopolist prices its goods below cost in order to drive other competitors out of the market.  Once its competitors have been eliminated, the monopolist raises its prices to supracompetitive levels. *Brooke Grp.*, 509 U.S. at 226; *Cargill, Inc. v. Monfort of Colo.*, 479 U.S. 104, 121 n.17 (1986). To plead predatory pricing, an antitrust plaintiff must plausibly allege both (1) "that the prices complained of are below an appropriate measure of [the defendant's] costs"; and (2) that the defendant had "a dangerous probability[] of recouping its investment in below-cost prices." *Brooke Grp.*, 509 U.S. at 222–24; *ZF Meritor*, 696 F.3d at 272.

The Third Circuit (but not the Supreme Court) has also recognized a bundled discount exception to the general rule protecting price discounts.  A bundled discount is when a firm sells a bundle of goods for a lower price than the seller charges for the goods purchased individually. In *LePage's*, the Third Circuit held that bundled discounts can constitute anticompetitive conduct even when the predatory pricing test is not met (for example, because the goods are sold above cost).  324 F.3d at 154–157.  Under the *LePage's* standard, the antitrust plaintiff must show that the effect of the discounts is to "foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer."[5]  *Id.* at 155.

---

[5] The *LePage's* standard for bundled discounts has not been adopted by any other Circuit Court of Appeals, and it has not been expanded in the Third Circuit.  *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894-903, 908-09 (9th Cir. 2008) (discussing the controversy over *LePage's*).  The Third Circuit has instructed courts to interpret *LePage's* narrowly in light of more recent Supreme Court precedent.  *See ZF Meritor*, 696 F.3d at 274 n.11 (acknowledging the Supreme Court's recent emphasis on adherence to the predatory pricing test to assess the legality of price discounts).

In its motion to dismiss, Align argues that the amended complaint fails to plausibly allege that 3Shape was unable to make "a comparable offer" to Align's Fusion Program discount within the meaning of *LePage's*.  According to Align, 3Shape must allege that it could not match the price of the iTero scanner if the aggregate Fusion program discount were allocated to the scanner. (D.I. 67 at 11; Tr. 18:14-19:20.)  Align points out that the amended complaint does not contain that allegation and, on the contrary, acknowledges that "3Shape could . . . drop its TRIOS price to compete with [the Fusion program] price."  (D.I. 63 ¶ 64.)

3Shape responds that it has adequately alleged its inability to make "a comparable offer" within the meaning of *LePage's* because it "does not manufacture an equally diverse group of products."  *LePage's*, 324 F.3d at 155.  3Shape only sells scanners, not aligners.  And it alleges that matching Align's Fusion program price on scanners would require 3Shape to forego a third of its revenue, whereas Align can make up for the discount from the sale of the additional Invisalign cases.  (D.I. 63 ¶¶ 64, 137; Tr. 26:13-27:1)

The problem I am confronted with is that neither side adequately articulates what "a comparable offer" means, or how it is plausibly alleged in the Third Circuit at the pleading stage. It seems to me that 3Shape's articulation would allow an antitrust plaintiff who only sells one product to state a claim whenever a dominant seller provides a discount for ordering products in multiple lines.  (D.I. 71 at 8; Tr. 29:3-13.)  I am highly skeptical of that articulation since it does not require any consideration of the size of the discount.  On the other hand, contrary to Align's argument, the Third Circuit in *LePage's* did not require a showing that the aggregate discount resulted in a below-cost price when allocated to a single product, nor did it require a showing that the plaintiff could not match the aggregate discount.  *See generally LePage's*, 324 F.3d at 175-76 (Greenberg dissenting) ("LePage's did not even attempt to show that it could not compete by

calculating the discount that it would have had to provide in order to match the discounts offered by 3M through its bundled rebates . . . ."); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 749d3 n.92 (4th ed. 2020).

The line must be somewhere in the middle.  Under the circumstances here, where the amended complaint alleges not only that a defendant with market power offered a discount for purchasing products in multiple lines, but it also alleges facts supporting the allegation that the plaintiff "could not compete effectively" if it matched the aggregate discount applied to a single line (D.I. 63 ¶ 64), I think it states a plausible bundled discounting claim.  I am not stating where I think the line for plausibly asserting a bundled discount claim exists, I am merely stating my conclusion that it has been crossed here.

The amended complaint also plausibly alleges facts suggesting that "portions of the [scanner] market" have been "foreclosed" to potential competitors.  *LePage's*, 324 F.3d at 155. For example, the amended complaint alleges that 3Shape's scanner sales have "fallen precipitously as dental professionals have ceased purchasing the TRIOS scanner as they have been forced to turn instead to the iTero scanner," and that iTero sales have increased by 84 percent.  (D.I. 63 ¶¶ 55, 136.)

Align again points out that the amended complaint fails to include details about the number of customers lost or the percentage of market foreclosure.  However, the cases cited by Align do not support the proposition that such details are required at the pleading stage.  *See, e.g., Dentsply Int'l*, 399 F.3d at 189 (3d Cir. 2005) (trial); *Microsoft*, 253 F.3d at 58 (same).

16

Here, viewing the amended complaint in its entirety and in the light most favorable to 3Shape, I agree with 3Shape that it plausibly alleges an exclusionary bundled discount arrangement.[6]

## B.  Monopoly Power in a Relevant Market

To succeed on a claim under Section 2 of the Sherman Act, the plaintiff must also demonstrate the defendant's possession of monopoly power in a relevant market (for a monopolization claim) or a dangerous probability of achieving monopoly power in a relevant market (for an attempted monopolization claim).  *Dentsply*, 399 F.3d at 186–87; *Phila. Taxi Ass'n*, 886 F.3d at 339.  Align argues that 3Shape failed to plausibly allege relevant scanner and aligner markets in which Align has monopoly power or a dangerous probability of achieving it.  I disagree.

The Supreme Court has defined monopoly power as "the power to control prices or exclude competition."  *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (quoting *United States v. E. I. du Pont De Nemours & Co.*, 351 U.S. 377, 391 (1956)).  The existence of monopoly power in a relevant market may be proven "through direct evidence of supracompetitive prices and restricted output."  *Broadcom*, 501 F.3d at 307.  Alternatively, monopoly power may be inferred from indirect evidence, where the plaintiff shows that a defendant "has a dominant share in a relevant market, and that significant 'entry barriers' protect that market."  *Broadcom*, 501 F.3d at 307 (citing *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380–81 (3d Cir. 2005)).

---

[6] Because I conclude that the amended complaint plausibly alleges anticompetitive conduct in connection with Align's DSO arrangements and its Fusion Program (which will result in the case moving forward), I do not address Align's argument that its Advantage Program does not constitute anticompetitive conduct.  Align is free to re-raise at the summary judgment stage its arguments that the Advantage Program is not actionable anticompetitive conduct, either alone or in connection with its other conduct.

Section 2 plaintiffs who take the indirect route bear the burden of defining a "relevant market." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). "Competing products are in the same market if they are readily substitutable for one another; a market's outer boundaries are determined by the reasonable interchangeability of use between a product and its substitute, or by their cross-elasticity of demand." *Broadcom*, 501 F.3d at 308.

The plaintiff must adequately allege a proposed relevant market in its complaint. *Id.*; *see also Queen City Pizza*, 124 F.3d at 436. A complaint may be dismissed for failure to plead a relevant market where the plaintiff "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Queen City Pizza*, 124 F.3d at 436. A complaint is also legally insufficient and subject to dismissal where the "proposed relevant market . . . clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Id.* However, in general, the determination of a relevant market is a "complex and fact-intensive inquiry." *Philadelphia Taxi Ass'n*, 886 F.3d at 341–42. Accordingly, courts should deny motions to dismiss unless "the alleged market makes 'no economic sense under any set of facts.'" *PepsiCo, Inc. v. Coca–Cola Co.*, No. 98-3282, 1998 WL 547088, at *6 (S.D.N.Y. Aug. 27, 1998). "Absent an inherently implausible market allegation, the question must be resolved on the facts and economic realities of the case." *Id.*

Align challenges 3Shape's proposed scanner and aligner market definitions on the basis of their product scopes as well as their geographic scopes. Align first argues that 3Shape's scanner and aligner market definitions both improperly define the geographic market as the United States. According to Align, the amended complaint "reveals nothing about why demand conditions are bounded at the United States and not more narrowly or broadly." (D.I. 72 at 6.) I disagree.

18

The amended complaint alleges that Align sells its products in all fifty states.  (D.I. 63 ¶¶ 159, 173.)  That is a plausible reason why the geographic markets should not be defined any smaller.  The amended complaint also alleges facts making it plausible that the geographic markets should not be defined any larger, namely, differences in the United States markets arising from the fact that Align only terminated interoperability with the TRIOS scanner in the United States and not elsewhere.  (*Id.* ¶¶ 93-94.)  And there is no reason to think that 3Shape is attempting to gerrymander a geographic market, as was the situation in the case cited by Align.  *See Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991) (rejecting "an oddly configured" geographic market "stretching 6.36 miles east, 7 miles west, 11.45 miles north and 10 miles south").  Taking the allegations in the amended complaint as true, I cannot conclude that 3Shape's geographic market definitions are inherently implausible.

Align also challenges both the scanner and aligner product market definitions.  As for scanners, Align argues that 3Shape's market definition is too narrow.  I conclude that the definition of the scanner market in 3Shape's amended complaint is not inherently implausible.

The amended complaint defines the scanner market as "the market for digital intraoral scanners used by dental professionals to generate full mouth scans to order [clear] aligners."  (*Id.* ¶ 1.)  It alleges that silicone molds are not adequate substitutes for scanners, for example, because they are inconvenient and unpleasant to for the patient.  (*Id.* ¶¶ 166-170.)  The amended complaint also alleges that scanners designed to scan individual teeth for crowns and local dental restorative work are not adequate substitutes, for example, because they are slower and less accurate.  (*Id.* ¶¶ 158-165.)  Those allegations describing the differences between the market as alleged and potential substitutes are sufficient to survive a motion to dismiss, particularly since defining the relevant market is a "fact-intensive inquiry."  *Philadelphia Taxi Ass'n*, 886 F.3d at 341–42.

3Shape also argues that Align fails to sufficiently allege a relevant market for aligners. 3Shape contends that the amended complaint "does not allege facts that would enable the Court to conclude that traditional braces do not substitute for clear aligners." (D.I. 72 at 6.) I disagree.

It is not inherently implausible that there is a relevant market for aligners. The amended complaint defines the aligner market as "the market for custom-manufactured removable dental aligners made of clear plastic that correct teeth misalignment." (D.I. 63 ¶ 1.) It alleges that "[c]ustomers do not see Clear Aligners as reasonably interchangeable with traditional metal braces" and that "cross-elasticity of demand is not present between Clear Aligners and metal braces." (*Id.* ¶¶ 143, 147.) And it sets forth reasons why that is so, for example, because aligners cause less discomfort and require less time for treatment. (*Id.* ¶¶ 143-148.) Those allegations are sufficient to survive a motion to dismiss.[7]

---

[7] Align also argues, in a footnote, that 3Shape lacks antitrust standing to assert its claim that Align monopolized the aligner market. (D.I. 67 at 19 n.12.) To establish antitrust standing, a plaintiff must show that it has suffered an "antitrust injury"—that is, an "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful.'" *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 233 (3d Cir. 2013) (alteration in original) (quoting *Brunswick Corp.*, 429 U.S. at 489). Typically, only consumers and competitors in the restrained market have antitrust standing. *See W. Penn*, 627 F.3d at 102. A plaintiff may also have antitrust standing when its "injuries are the means by which the defendant[] seek[s] to achieve [its] anticompetitive ends." *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 172 (quoting *W. Penn*, 627 F.3d at 102).

Antitrust standing is a prudential limitation rather than a jurisdictional requirement. *Ethypharm*, 707 F.3d at 232. As such, antitrust standing "is more properly viewed as an element of an antitrust claim" that can be resolved at a later stage of the case. *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 164 (3d Cir. 2017).

Align does not challenge 3Shape's standing with respect to the scanner market, but it points out that 3Shape is neither a competitor nor a consumer in the aligner market. Having reviewed the complaint in its entirety, I find that 3Shape has plausibly alleged that the injuries it suffered to its scanner business as a result of Align's conduct were the means by which Align sought to maintain its monopoly in the aligner market. I conclude, therefore, that 3Shape has adequately pleaded antitrust standing at this stage. Align is free to re-raise its antitrust standing arguments at the summary judgment stage.

## IV.  CONCLUSION

For the reasons set forth above, I recommend that Align's motion be DENIED.  Align is, of course, free to re-raise all of its defenses at the summary judgment stage.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B),(C), Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1.  Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages.  Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated October 9, 2013, a copy of which can be found on the Court's website.


Dated: May 20, 2020

Jennifer L. Hall
UNITED STATES MAGISTRATE JUDGE

21